IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS—AUSTIN DIVISION

| | | |
|---|---|---|
| JACQUELINE MCAFERTY, individually | § | |
| and on behalf of all others similarly situated, | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | No. 1:24-cv-1346 |
| | § | |
| ELON REEVE MUSK & AMERICA PAC, | § | |
| *Defendants.* | § | |

### DEFENDANTS' MOTION TO DISMISS

Defendants Elon Musk and America PAC move to dismiss Plaintiff's "First Original Class Action Complaint" (ECF No. 1) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### INTRODUCTION

In late 2024, America PAC, a political committee, encouraged registered voters in seven states ("Eligible Voters") to sign a citizen petition supporting the First and Second Amendments to the U.S. Constitution. America PAC offered to pay $47 to each Eligible Voter who referred (the "Referrer") another Eligible Voter (the "Referee") to sign the petition. Once someone was verified as an eligible Referrer of an eligible Referee, America PAC paid the Referrer $47 per eligible referral. In addition, all petition signers who were verified Eligible Voters also qualified to be considered and potentially selected for the opportunity to earn $1 million in return for their agreement to serve as a paid spokesperson for America PAC and the citizen petition.

When a verified Eligible Voter learned that they were selected as a spokesperson—and, in doing so, would earn $1 million—their natural reaction was euphoric. Indeed, the selected earners experienced intense excitement and happiness, much like the reaction that someone would experience upon learning that they have won a lottery. But make no mistake: **<u>an Eligible Voter's</u>** **<u>*opportunity to earn*</u>** **<u>is not the same thing as a *chance to win*</u>**. Unlike a lottery, which requires,

*inter alia*, winners determined by chance, America PAC vetted and selected its $1 million spokespersons. Like a job application, verified Eligible Voters who signed the petition were reviewed and considered for a potential opportunity to become a paid spokesperson. But whether the payment to an Eligible Voter was a $47 check or a $1 million wire, the Eligible Voter had to do something to earn the money. For a $47 check, the Eligible Voter had to make a valid referral. For a $1 million wire, the Eligible Voter had to sign and perform a spokesperson contract.

Plaintiff says that she perceived America PAC's citizen petition effort as a "lottery." This is wrong. A lottery requires three elements to coexist: (1) prize; (2) chance; and, (3) consideration. Tex. Penal Code § 47.01(7). Plaintiff concedes that "chance" was not involved here, as individuals earned money by referring verified Eligible Voters to sign the petition (or, if selected, by fulfilling a spokesperson contract). Thus, as a matter of fact and of law, no "lottery" exists. Yet Plaintiff inserts this erroneous "lottery" premise into her Complaint to support three substantive claims: fraud, breach of contract, and an alleged Texas Deceptive Trade Practices Act ("DTPA") violation.

This case should be dismissed for three primary reasons. <u>First</u>, Plaintiff lacks standing because she has not alleged injury—she does not specify any manner *whatsoever* in which Defendants' alleged conduct has harmed (or even impacted) her. <u>Second</u>, Plaintiff's claims sound in fraud and fail because she did not plead fraud with particularity as Federal Rule of Civil Procedure 9(b) requires. <u>Third</u>, Plaintiff does not state a plausible claim under any legal theory she posits. The fraud claim fails because she identifies no false representation by Defendants. The breach of contract claim because Plaintiff does not allege the existence of a valid or enforceable contract. And the DTPA claim fails because Plaintiff is not a "consumer" under the DTPA. Without standing or any substantive legal claim, Plaintiff's request for injunctive relief also fails.

Plaintiff's allegations are not the first to have been considered in court. In October 2024, the Philadelphia District Attorney filed a civil suit alleging that America PAC's citizen petition program was an illegal lottery and a violation of the Pennsylvania Consumer Protection Act.[1] After extensive briefing and an evidentiary trial, those claims were rejected[2] and the Philadelphia DA dropped his case.[3] Plaintiff's attempt to recast this "lottery" theory under Texas law similarly fails.

FACTUAL BACKGROUND

## I.   The Parties

Elon Musk founded America PAC, a Virginia corporation registered with the Federal Election Commission as an independent expenditure only political committee. Compl. ¶¶ 6–7.[4] America PAC's mission is to "support 'Secure Borders, Safe Cities, Free Speech, Sensible Spending, Fair Justice System and Self-Protection.'" *Id.* ¶ 6.

Plaintiff Jacqueline McAferty states that she is "a citizen and resident of Maricopa County, Arizona," Compl. ¶ 4, but does not state whether she is a registered voter, *see* Compl.

## II.   America PAC's Citizen Petition Program and $1 Million Spokesperson Opportunities

Beginning in October 2024, visitors to America PAC's website could sign a "Petition in Favor of Free Speech and the Right to Bear Arms." *Id.* ¶ 10. The petition states: "The First and Second Amendments guarantee freedom of speech and the right to bear arms. By signing below, I am pledging my support for the First and Second Amendments."[5] To sign the petition, one must

---

[1] *Krasner v. America PAC*, No. 3509 (Pa. Phila. Cty. C.P., Oct. Term 2024), https://www.pacourts.us/Storage/media/pdfs/20241028/193831-oct.28,2024-krasnervsmusk.pdf.

[2] Findings of Fact & Conclusions of Law, *Krasner v. Musk*, No. 241003509 (Pa. Phila. Cty. C.P. Nov. 12, 2024), https://www.pacourts.us/Storage/media/pdfs/20241113/183454-krasnervmusketalfindingsoffactandconclusionsoflaw.pdf, APPX.001.

[3] Praecipe to Discontinue & End, *Krasner v. Musk*, No. 241003509 (Pa. Phila. Cty. C.P. Nov. 21, 2024), APPX.038.

[4] America PAC's FEC ID number is C00879510, and its activity reports are publicly available on the FEC website at https://www.fec.gov/data/committee/C00879510/.

[5] https://petition.theamericapac.org/, APPX.041

type a first and last name, email, mailing address, and phone number and click "Sign Petition." *Id.* ¶¶ 20, 21. Under cell phone number, the petition says "Will only be used to confirm you are the legitimate petition signer. No other purpose." *Id.* ¶ 21. The website's Privacy Policy states

> America PAC values your privacy and trust. Personal Identifying Information collected via the www.theamericapac.org will only be used to support America PAC's activities, and it will not be shared with any advertisers, political organizations, or third parties not directly affiliated with America PAC.[6]

America PAC encouraged registered voters who signed the petition to refer others to do the same, "with an offer to pay individuals $47 for each registered voter referred who signed the petition." *Id.* ¶ 10. This earning opportunity "was 'exclusively open to' Eligible Voters, *i.e.*, 'registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina' and 'expire[d] November 5.'" *Id.*

At an October 19, 2024 town hall, Musk announced an effort to promote the petition: "I have a surprise for you. Which is that we're going to be awarding $1 million dollars, randomly, to people who have signed the petition. Every day from now until the election." *Id.* ¶ 12 (citing @America, X (Oct. 19, 2024, 11:06 PM), https://x.com/america/status/1847851986495881434 (video embedded in URL)). Musk then called an audience member, John Dreher, to the stage as the first $1 million recipient, and told Dreher, "The only thing we ask for the million dollars is that you be a spokesperson for the petition." *Id.*; *see also* Compl. ¶¶ 12, 14–16. America PAC quickly posted a video of the announcement on X, *id.* ¶ 12, and later posted, "Every day from now until Election Day, one registered swing state voter who signs the petition will be ***selected to earn*** $1 MILLION," along with a link to the petition. *Id.* ¶ 17 (citing @America, X (Oct. 19, 2024, 11:58 PM), https://x.com/america/status/1847864967816511758) (emphasis added). Musk made a similar X

---

[6] https://theamericapac.org/privacy-policy, APPX.044.

post that evening. *Id.* ¶ 18 (citing @ElonMusk, X (Oct 19, 2024, 11:25 PM), https://x.com/elonmusk/status/1847856712914555061).

The next day, at another America PAC town hall, Musk announced audience member Kristine Fiskell as a $1 million spokesperson. *Id.* ¶ 19. In total, nine people were selected to earn $1 million as a spokesperson. *Id.* ¶ 23. Plaintiff notes that each person "is featured on America PAC's website and X handle," but does not discuss the other public statements Defendants made about the $1 million opportunities or the petition program. She concedes, however, that those selected for a $1 million spokesperson opportunity were "chosen based on their personal stories," and had to sign and perform "a contract with America PAC." *Id.* ¶¶ 26, 28.

**III.   After Not Being Selected to Earn $1 Million as a Spokesperson, Plaintiff now Claims that the PAC's Citizen Petition Program was Illegal.**

Plaintiff signed the petition on October 20, 2024, providing her "first and last name, email address, mailing address, and cell phone number." *Id.* ¶¶ 31–32. She does not allege that she is an Eligible Voter (*i.e.*, a registered voter in one of the seven states who would have been eligible to receive any payment through the citizen petition program—whether it was a $47 referral payment or a $1 million spokesperson payment). Nor does she allege that she referred any verified Referee to sign the petition in exchange for any $47 referral payment. Plaintiff was not selected to earn $1 million as a spokesperson and sues. Plaintiff alleges that she "had no ***chance*** of receiving $1,000,000," *id.* ¶ 35 (emphasis added), thereby conceding that there was no lottery. *See* Tex. Penal Code § 47.01(7) ("'Lottery' means any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value."). But she complains that she *perceived* the citizen petition program as a "lottery" where $1 million recipients would be selected by "random drawing." Compl. ¶¶ 20, 59, 67, 71, 72, 75, 79, 82 (alleging a "lottery"); 67 (alleging that "Defendant" "agreed" to select $1

million recipients by "drawing randomly"). Plaintiff claims that her perception of a lottery gives rise to three substantive legal claims and a right to an injunction.

ARGUMENT AND AUTHORITY

**I.    This case should be dismissed under Rule 12(b)(1) for lack of jurisdiction.**

**a.    Standard for Dismissal Under Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. "Federal courts do not possess a roving commission to publicly opine on every legal question," nor do they "exercise general legal oversight … of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Rather, Article III of the Constitution limits federal court jurisdiction to actual "cases" and "controversies." U.S. CONST. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). Accordingly, when a court lacks statutory or constitutional power to adjudicate a case, that case must be dismissed for lack of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Jurisdiction is a threshold issue that must be resolved before reaching the merits. *Id.* at 94–95.

The "irreducible constitutional minimum" of standing requires three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must have: (1) suffered an injury in fact; (2) that is traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env'tl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000). As the party invoking the court's jurisdiction, a plaintiff has the burden to show all three elements. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo*, 578 U.S. at 338 (citation omitted) (cleaned up). In other words, "[i]f the plaintiff does not claim to

have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion*, 594 U.S. at 423 (citation omitted).[7]

    **b.**    **Plaintiff has no case or controversy with Defendants because she has not pled eligibility to participate in the citizen petition program.**

As a threshold matter, Plaintiff has not carried her burden to allege standing because she does not plead that she was an Eligible Voter in the first place. Plaintiff admits that the citizen petition program "was '*exclusively open to registered voters* in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina.'" Compl. ¶ 10 (emphasis added) (quoting https://petition.theamericapac.org/). But Plaintiff does not allege that *she* is a registered voter in any of these states. Without affirmatively alleging that she was eligible to participate in the citizen petition program, Plaintiff lacks standing to challenge it. *See, e.g. O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."). But even if Plaintiff had pled eligibility to participate in the petition program, she would still lack standing because she has not alleged injury in fact.

    **c.**    **Plaintiff lacks Article III standing because she has not pled injury in fact.**

"To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing." *TransUnion*, 594 U.S. at 417. To show concrete harm, a plaintiff must have suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or

---

[7] That Plaintiff brings this case as a putative class action does not impact the threshold showing required to withstand a 12(b)(1) motion. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("'That a suit may be a class action … adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured'") (quoting S*imon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)).

hypothetical." *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560). To be concrete, an injury must "actually exist," though it may be "tangible" or "intangible." *Id.* Most obvious injuries are "traditional tangible harms, such as physical harms and monetary harms," but "[v]arious intangible harms can also be concrete," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (citations omitted). "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (citation omitted).

Merely invoking a statutory cause of action does not satisfy Article III. That is because "[i]njury in fact is a constitutional requirement, and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 578 U.S. at 339 (citations omitted) (cleaned up). To be sure, "[i]n determining whether a harm is sufficiently concrete to qualify as an injury in fact," courts "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425. But the Supreme "Court has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 426 (quoting *Spokeo*, 578 U.S. at 341). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* For example, the Supreme Court has explained that—although the Fair Credit Reporting Act (FCRA) prohibits distributing false consumer information—"not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to

imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm" for Article III standing purposes. *Spokeo*, 578 U.S. at 342.

Remarkably, the whole of Plaintiff's asserted injury is that "Plaintiff and other members of the proposed Class *suffered damages by giving their personal information to Defendants*." Compl. ¶¶ 60, 68, 77. This does not state injury in fact, because Plaintiff's provision of her name, mailing address, email, and phone number—without more—is not a "concrete harm" under Article III.

The Supreme Court recently addressed concreteness in *TransUnion*, which involved the practice of flagging consumer credit files with an alert based on loose matches with the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") list. 594 U.S. at 443. This "generated many false positives." *Id.* at 419–20. A class of consumers whose credit reports received OFAC alerts sued, alleging that TransUnion "failed to comply with statutory obligations [under the FCRA] to follow reasonable procedures to ensure the accuracy of credit files so that the files would not include OFAC alerts labeling the plaintiffs as potential terrorists." *Id.* at 430.

In assessing concrete harm, the Court "distinguishe[d] between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors." *Id.* at 434. This matters because "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* On the other hand, when "TransUnion provided third parties with credit reports containing OFAC alerts that labeled [] class members as potential terrorists, drug traffickers, or serious criminals" those class members "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation," which is "a concrete harm that qualifies as an injury in fact." *Id.* at 442. Thus, the Court held that only those "class members whose credit reports were provided to third-party businesses suffered a concrete harm and thus have standing as to the

reasonable-procedures claim." *Id.* The "class members whose credit reports were not provided to third-party businesses did not suffer a concrete harm and thus do not have standing." *Id.* at 442.

Diligent research for this motion revealed *no case* where an unadorned allegation that a defendant wrongly obtained a plaintiff's name, mailing address, email, and phone number was enough to state concrete harm for Article III standing purposes. Rather, "concrete harm" related to allegedly wrongful access to a plaintiff's personal information has been found where a plaintiff suffered a concrete consequence because their information was shared (for example, in certain data breach cases, discussed *infra*). No such concrete consequence is alleged here.

The most analogous case found, *Hancock v. Urban Outfitters*, involved a store's practice of requesting customer zip codes during credit card transactions. 830 F.3d 511, 512 (D.C. Cir. 2016). The plaintiffs claimed that this practice violated District of Columbia consumer protection laws by (i) falsely implying that a zip code is required for a credit card transaction; (ii) omitting the material fact that providing a zip code is optional; (iii) deceptively representing that requesting zip codes is legal and necessary for a credit card purchase; and (iv) violating a prohibition on obtaining addresses as a condition of a credit card transaction. *Id.* at 512–13.

The Court of Appeals held that the plaintiffs had not alleged concrete harm, reasoning, "If, as the Supreme Court advised [in *Spokeo*,] disclosure of an incorrect zip code is not a concrete Article III injury, then even less so is [plaintiffs'] naked assertion that a zip code was requested and recorded without any concrete consequence." *Id.* at 514. The court noted that the plaintiffs "do not allege, for example, any invasion of privacy, increased risk of fraud or identity theft, or pecuniary or emotional injury," and concluded that "without any plausible allegation of Article III injury, the complaint fails to state a basis for federal court jurisdiction." *Id.*

10

So too here. Plaintiff alleges that her name, mailing address, email, and phone number were "requested and recorded without any concrete consequence." *Id.* Accordingly, like the plaintiffs in *Hancock*, McAferty has not alleged concrete harm and she lacks standing. *See also, e.g.*, *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) (plaintiff lacked standing under federal Cable Communications Policy Act to sue cable company for retaining personal information longer than the Act allowed because plaintiff "identifies no material risk of harm from the retention[,] [and] a speculative or hypothetical risk is insufficient.").

Similar results are obtained in data breach cases. These cases are not directly on-point because they typically involve enough information to subject someone to identity theft, whereas the phone number, mailing address, and email Plaintiff provided pose no such risk.[8] But even in cases involving (1) information far more sensitive than what is at issue here; and (2) an undisputed "breach" of a database a defendant had a duty to secure, courts do not recognize simple disclosure of or access to a plaintiff's information as a concrete harm for Article III purposes. *See, e.g.*, *Eubanks v. Nelson*, No. 23-10936, 2024 WL 1434449, at *2 (5th Cir. Apr. 3, 2024), *cert. denied sub nom.*, *Gremont v. Nelson*, No. 24-258, 2024 WL 4654988 (U.S. Nov. 4, 2024) (where plaintiffs alleged disclosure of their information via electronic voting systems, and "believe[d] that the release of their private and personal combination of information ma[de] them easy to identify and thus susceptible to harassment … this alleged injury constitutes an undifferentiated, generalized

---

[8] *Compare, e.g.*, *In re SuperValu, Inc.*, 870 F.3d 763, 770 (8th Cir. 2017) (plaintiffs did not plead concrete harm where hackers accessed credit card information, which "generally cannot be used alone to open unauthorized new accounts" and "does not include any personally identifying information, such as social security numbers, birth dates, or driver's license numbers") (citation omitted); *with Clemens v. ExecuPharm, Inc.*, 48 F.4th 146, 150 (3rd Cir. 2022) (plaintiff pled concrete harm where (1) hackers stole "social security numbers, dates of birth, full names, home addresses, taxpayer identification numbers, banking information, credit card numbers, driver's license numbers, sensitive tax forms, and passport numbers;" (2) information was for sale on the dark web; and, (3) plaintiff spent time and money mitigating identity theft and attending therapy).

grievance that is not particular to them. It is also too speculative to provide a basis for standing.") (citations omitted) (cleaned up); *Logan v. Marker Group, Inc.*, No. 4:22-CV-00174, 2024 WL 3489208, at *5 (S.D. Tex. July 18, 2024) (data breach plaintiffs lacked standing because "conclusory statements alleging actual incidents of identity theft are insufficient to establish an injury in fact because such injuries require a showing that 'the information accessed was actually misused or that there has even been an attempt to use it.'") (quoting *Green v. eBay Inc.*, No. CIV.A.14-1688, 2015 WL 2066531, at *4 (E.D. La. May 4, 2015)); *Bednyak v. Fin. Risk Mitig., Inc.*, No. CV 24-25, 2024 WL 4869157, at *9 (E.D. La. May 31, 2024) ("Implicitly, Bednyak's position is that a data breach *ipso facto* establishes concrete injury due to diminished value of PII but this is not the law.").[9] There is simply no harm here in the context of Article III.[10]

## II.   This case should be dismissed under Rule 12(b)(6) for failure to plead a plausible claim.

### a.   Standard for Dismissal under Rule 12(b)(6)

Dismissal is proper under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.*

---

[9] *See also, e.g., Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011) ("In data breach cases where no misuse is alleged … there has been no injury"); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344 (11th Cir. 2021) ("vague, conclusory allegations that members of the class have suffered any actual misuse of their personal data … are not enough to confer standing."); *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 303–04 (2d Cir. 2021) ("Because McMorris did not allege that her PII was subject to a targeted data breach or allege any facts suggesting that her PII … was misused, the district court correctly dismissed her complaint for failure to establish an Article III injury in fact.").

[10] Moreover, although a plaintiff may plead injury in fact by alleging a "future" injury, such injury must be "imminent," meaning "there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "[A]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiff does not allege any future injury; she does not allege any future conduct by Defendants *at all*. *See* Compl.

*v. Twombly*, 550 U.S. 544, 570 (2007). This requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted) (cleaned up).

Though a court deciding a motion to dismiss accepts well-pleaded facts as true and construes them in favor of the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Rather, the factual allegations must be enough to "raise a right of relief above the speculative level," assuming *arguendo* that those factual allegations are true. *Twombly*, 550 U.S. at 555. To meet this standard, a complaint must plead facts sufficient "to raise a right to relief above the speculative level." *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007).

**b.    This case should be dismissed for failure to plead fraud with particularity.**

Federal Rule of Civil Procedure 9(b) requires that a party "alleging fraud...must state with particularity the circumstances constituting fraud," except that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Allegations of fraud must [] meet a higher, or more strict, standard than the basic notice pleading required by [Federal] Rule [of Civil Procedure] 8" because, among other things, "unsubstantiated charges of fraud can irreparably damage a defendant's reputation." *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir. 1994) (citations omitted). Thus, "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." *Southland Securities Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004). Importantly, "Rule 9(b) applies by its plain

language to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club v. Schlotzky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).[11]

Plaintiff's "fraud" claim is subject to Rule 9(b). So too are her breach of contract and DTPA claims, since those claims arise from the same allegedly fraudulent conduct by Defendants. *See, e.g.*, *Dommert v. Raymond James Fin. Servs., Inc.*, No. CIV A. 1:06-CV-102, 2007 WL 1018234, at *12 (E.D. Tex. Mar. 29, 2007) ("When a claim for [] breach of contract is essentially a claim sounding in fraud, the particularity requirements of Rule 9(b) apply."); *Berry v. Indianapolis Life Ins. Co.*, 608 F.Supp.2d 785, 800 (N.D. Tex. 2009) ("It is well-established that claims alleging violations of the DTPA are subject to the requirements of Rule 9(b). A comparison of Plaintiffs' DTPA claim...with its fraud claim reveals that the DTPA claim is predicated on the same misrepresentations and omissions as the fraud claim.") (citations omitted) (cleaned up). Each of Plaintiff's substantive claims is "predicated on the same" alleged "false representations." *Id.*; Compl. ¶¶ 55, 64, 74 ("Defendants' representations were false because they have since admitted that the winners were pre-determined."). Thus, each must be pled with particularity per Rule 9(b).

The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund,*

---

[11] "The requirements of Rule 9(b) apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud … This is true even in cases where fraud is not a necessary element of a claim. Even in such cases, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct, or allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim, in which event the claim is said to be grounded in fraud or to sound in fraud, and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Clouse v. Success Sys., LLC*, No. SA-23-CV-1380-OLG (HJB), 2024 WL 4002774, at *3 (W.D. Tex. Aug. 6, 2024), *report & recommendation adopted*, No. SA-23-CV-1380-OLG, 2024 WL 3998289 (W.D. Tex. Aug. 27, 2024) (citations omitted) (cleaned up).

*Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted). "[G]eneral allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)." *In re Urcarco Sec. Lit.*, 148 F.R.D. 561, 569 (N.D. Tex. 1993), a*ff'd*, *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *see also Patel v. Holiday Hospitality Franchising, Inc.*, 172 F.Supp.2d 821, 825 (N.D. Tex. 2001) (DTPA claim based on fraudulent misrepresentations was subject to and failed Rule 9(b) where "plaintiffs lumped both defendants together and failed to sort out the wrongdoing of each defendant.").

The Complaint fails this standard. It references several X posts (by Musk and the PAC) and two town hall speeches (by Musk) but does not specify *which of these statements* was allegedly fraudulent. Instead, it obliquely alleges that "Defendants made material representations, i.e. that by signing the petition, Plaintiff and members of the proposed Class were eligible to win $1,000,000." Compl. ¶¶ 54, 63, 73. This allegation—which the Complaint repeats for all three substantive claims—fails to "identify the speaker, state when and where the statements were made, and explain why the" purportedly actionable "statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund v. TXU Corp.*, 565 F.3d at 207. It further "lump[s] all defendants together failing to segregate the alleged wrongdoing of one from [] another." *In re Urcarco Sec. Lit.*, 148 F.R.D. at 569. Plaintiff also lists a singular "Defendant" as having "breached the contract," Compl. ¶ 67, and as having "engaged in an unconscionable course of conduct," *id.* ¶ 75, but does not specify which Defendant is charged with this alleged "breach," and "conduct." Similarly, while Musk founded America PAC—and is free to talk about its activities—his statements are not the official terms of the citizen petition program, but Plaintiff purports to rely on them as such.

As Rule 9(b) implicitly recognizes, it is impossible to respond to allegations of fraud when the Complaint does not even specify who is charged with what purportedly fraudulent conduct.

Accordingly, Plaintiff's substantive claims should be dismissed for failure to plead fraud with particularity as Rule 9(b) requires. But even if Rule 9(b) did not apply (or if the Complaint satisfied it), this case should still be dismissed because Plaintiff has not stated a plausible claim for relief.

### c.  Plaintiff has not pled a plausible legal claim.

#### i.  Plaintiff's fraud claim fails because she alleges no false representation.

To prevail on a fraud claim under Texas law, a plaintiff must show, *inter alia*, that "the defendant made a material representation that was false" and "the plaintiff actually *and justifiably* relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citations omitted) (emphasis added). Plaintiff's fraud claim fails because the pleadings negate the existence of three essential elements.

<u>No false representation.</u> Plaintiff alleges "false representations" on the theory that Musk's use of the word "randomly" to describe spokesperson selection, Compl. ¶ 27–29, is irreconcilable with the fact that spokespersons "were pre-determined." *Id.* ¶ 55, 64, 74 ("Defendants' representations were false because they have since admitted that the winners were pre-determined."). Merriam-Webster defines "randomly" as "lacking a definite plan, purpose, or pattern."[12] Synonyms include "scattered," "erratic," accidental," and "arbitrary."[13] That the PAC "pre-determined" spokespersons before announcing them is wholly consistent with the notion that spokespersons were chosen without "a definite plan, purpose, or pattern," and therefore does not allege any "false" representation by Defendants.

Nor does the word "randomly" falsely represent that there was "a genuine lottery," as Plaintiff suggests. Compl. ¶ 75. A lottery requires chance, prize, and consideration. Tex. Penal

---

[12] https://www.merriam-webster.com/dictionary/randomly.
[13] https://www.merriam-webster.com/thesaurus/random.

Code § 47.01(7). Plaintiff concedes that—from the first announcement of the $1 million opportunities on October 19—the requirement to serve as a spokesperson *in exchange for* the $1 million was disclosed, defeating any notion that the $1 million was a "prize" and any finding that Defendants represented the existence of a lottery. Plaintiff has not pled any false representation.

No justifiable reliance. Even if Defendants falsely represented a lottery (they did not), the Complaint forecloses a finding that Plaintiff's alleged reliance on such representation was justifiable. Under Texas law, "a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)) (cleaned up). Plaintiff pleads multiple "red flags" showing that no lottery was present.

Plaintiff admits that, in the same video where Musk loosely used the word "randomly" to describe the selection process, he also announced that any $1 million payment was conditioned on the requirement to "be a spokesperson for the petition." Compl. ¶ 16. Plaintiff also notes that as of October 20, when she signed the petition, the only two recipients who had been declared were *present at the town halls* where they were announced. *Id.* ¶¶ 15, 19, 31. She even refers to the PAC's post—made "[s]hortly after Musk's live announcement of Mr. Dreher,"—specifying that $1 million recipients were being "***selected to earn*** $1 MILLION." *Id.* ¶ 17 (citation omitted) (emphasis added). This shows that, even if Plaintiff relied on a false representation by any Defendant to conclude that there was a "lottery," such reliance is not justifiable under Texas law.

No damages. For the same reasons Plaintiff fails to allege injury for standing purposes, she also fails to allege damages for purposes of her fraud claim and fails to state an essential element thereof. Accordingly, Plaintiff's fraud claim fails on the pleadings.

###### ii.    Plaintiff's breach of contract claim fails for want of a valid contract.

Under Texas law,

> A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach.

*USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n.21 (Tex. 2018) (citation omitted). At the 12(b)(6) stage, the complaint "must assert enough facts that make it plausible" that each element of a breach of contract claim is met. *Provision Grp., Inc. v. Crown Toxicology, Ltd.*, No. 5:16-CV-1291-DAE, 2017 WL 11221433, at *3 (W.D. Tex. Oct. 19, 2017). Plaintiff's breach-of-contract claim fails because she has not pled a valid contract or damages.

The pleadings foreclose a finding that there was a valid, enforceable contract. Plaintiff admits that the citizen petition program "was '*exclusively open to registered voters* in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina.'" Compl. ¶ 10 (emphasis added). Plaintiff does not allege that she is a registered voter in any of these states, which forecloses a finding that Defendants ever made an "offer" to her. Moreover, to prove a valid contract a plaintiff must show, among other things, a meeting of the minds on the essential terms. *Menchaca*, 545 S.W.3d at 502, n.21 (citation omitted). The allegation that "Defendants knew all along the winners were pre-determined, and had no intention of operating a genuine lottery as Defendant represented it would," Compl. ¶ 75, forecloses a showing of mutual assent to the terms that Plaintiff claims she and Defendants agreed to. In addition, the contract that Plaintiff alleges entering would be void and unenforceable, even if there were mutual assent. "Under Texas law, a contract is illegal, and thus void, if the contract obligates the parties to perform an action that is forbidden by the law of the place where the action is to occur." *In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008) (citation omitted). Texas law prohibits Defendants from operating a lottery. TEX. CONST.

art. III, § 47.[14] Accordingly, any contract that would obligate them to award $1 million payouts through a lottery would be unenforceable under Texas law for illegality.

Even if there were a valid contract that Defendants breached, Plaintiff provides no basis to conclude that her situation is any different as a result. Thus, she has not plausibly pled damages. *See, e.g.*, *Gensetix, Inc. v. Baylor Coll. of Med.*, 616 S.W.3d 630, 645 (Tex. App.—Houston [14th Dist.] 2020) ("The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage *actually sustained as a result of the breach*. The normal measure of damages for a breach-of-contract claim is the expectancy or benefit-of-the-bargain measure.") (citations omitted) (emphasis added). Failure to plead damages defeats this claim.

### iii.    Plaintiff's DTPA claim fails because Plaintiff is not a "consumer."

The DTPA exists "to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a). Under the "unconscionability arm" of the DTPA that Plaintiff invokes, "[a] *consumer* may maintain an action where the following constitute[s] a producing cause of economic damages or damages for mental anguish: any unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50 (a)(3) (emphasis added). Plaintiff's DTPA claim fails for at least three reasons.

First, and most obviously, Plaintiff is not a consumer. The DTPA defines a "consumer" as "an individual … who seeks or acquires by purchase or lease, any goods or services." *Id.* § 17.45(4). "Goods" are "tangible chattels or real property purchased or leased for use," whereas

---

[14] The Texas Constitution generally prohibits "lotteries," and "[t]he Legislature shall pass laws prohibiting lotteries and gift enterprises in this State *other than those authorized by … this section*." TEX. CONST. art. III, § 47 (emphasis added). The four exceptions in the Texas Constitution do not apply to the facts alleged here. *See id.* (exceptions apply to charitable bingo; raffles by religious and similar organizations; raffles by qualified professional sports teams; and the state lottery).

"'Services' means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." *Id.* § 17.45(2), (1). Plaintiff's theory of DTPA liability is that she "purchased the right to be in Defendants' lottery by providing her personal information." Compl. ¶ 11. Plaintiff concedes that spokespersons were not chosen by chance, and therefore concedes as a matter of fact and law that Defendants did not operate a lottery. *See, e.g.*, *supra*, p.5. But even if Defendants had operated a lottery, "a lottery ticket is a right to participate in the drawing. … As such, it is an intangible, and therefore neither a good nor a service" under the DTPA. *Kinnard v. Circle K Stores Inc.*, 966 S.W.2d 613, 618 (Tex. App.—San Antonio 1998, reh'rg overruled). Therefore, the DTPA does not apply to the allegations in the Complaint.

Second, Plaintiff does not allege "economic damages" or "mental anguish," as required for the DTPA to apply. Tex. Bus. & Com. Code § 17.50 (a)(3). Under the DTPA, "[e]conomic damages" means compensatory damages for pecuniary loss, including costs of repair and replacement. The term does not include exemplary damages…." Tex. Bus. & Com. Code § 17.45(11). The Complaint's threadbare allegation that "Plaintiff and other members of the proposed Class suffered damages by giving their personal information to Defendants," Compl. ¶¶ 60, 68, 77, does not allege any "economic damages" as defined by the DTPA or mental anguish.

Third, the DTPA does not apply where "every operative fact occurred outside of the state of Texas," because "[t]he DTPA requires that the 'trade or commerce' in question 'directly or indirectly affect[ ] the people of this state.'" *Cogan v. Triad Am. Energy*, 944 F. Supp. 1325, 1336 (S.D. Tex. 1996) (quoting Tex. Bus. & Comm. Code § 17.45(6)). Plaintiff is an Arizona resident, and the petition program was not open to Texas voters, Compl. ¶ 10. Moreover, Complaint does not claim that any alleged "misrepresentation" occurred in Texas. Accordingly, the facts alleged do not give rise to a Texas DTPA claim. *Cogan v. Triad Am. Energy*, 944 F. Supp. at 1336; *see*

*also Bass v. Hendrix*, 931 F. Supp. 523, 536 (S.D. Tex. 1996) ("any alleged misrepresentations …
occurred outside of Texas and it could not have been anticipated that they would have an effect on
a Texas resident. Under these circumstances, the applicability of the DTPA is doubtful.").

### d.    Plaintiff's claim for injunctive relief fails with her substantive claims.

Because all of Plaintiff's substantive claims fail, her claim for injunctive relief should also
be dismissed. *See, e.g.*, *Flowers v. Deutsche Bank Nat. Tr. Co.*, 614 F. App'x 214, 216 (5th Cir.
2015) ("[Plaintiff's] claims for a declaratory judgment and injunctive relief fail because none of
[Plaintiff's] substantive claims remain.").

## CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety.

Respectfully submitted,

*/s/ Anne Maire Mackin*
Anne Maire Mackin
Texas State Bar No. 24078898
Vantage Legal PLLC
P.O. Box 341016
Austin, TX 78734
Telephone: 512-354-1785
amackin@vantage.network

*/s/ Andy Taylor*
Andy Taylor
Texas State Bar No. 19727600
Andy Taylor & Associates, P.C.
2628 Highway 36S, #288
Brenham, Texas 77833
713-412-4025 (mobile)
ataylor@andytaylorlaw.com

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

On January 24, 2025, I hereby certify that I served the foregoing document on all counsel

of record by a manner authorized by Federal Rule 5(b)(2).

*/s/ Anne Maire Mackin*
Anne Maire Mackin