UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JACQUELINE McAFERTY, individually and on behalf of all others similarly situated,<br>    *Plaintiff,*<br><br>vs.<br><br>ELON REEVE MUSK and AMERICA PAC,<br>    *Defendants.* | §<br>§<br>§<br>§<br>§   No. 1-24-cv-1346<br>§<br>§<br>§<br>§ |

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DOC. 5)

### I.    INTRODUCTION

Defendants' Motion to Dismiss ("Motion") should be denied. The Motion repeatedly asks the Court to make factual findings in Defendants' favor, disregarding the appropriate standard of review. The Motion also attempts to hold Plaintiff's Complaint to a more stringent standard than is required under the law.

### II.    STANDARD OF REVIEW

Motions filed under Rule 12(b)(1) allow a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Absent standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims. *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006). The doctrine of standing addresses the question of who may properly bring suit in federal court and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing requires the satisfaction of three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendant's challenged conduct; and (3) a likelihood that the

injury suffered will be redressed by a favorable decision. *Id.* at 560–61. Defendant's motion focuses on the first requirement of standing—that a plaintiff must have suffered a concrete and particularized injury in fact to seek redress in federal court. "In class actions, 'named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class.' " *Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 407 (5th Cir. 2003) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering motions to dismiss under 12(b)(6), a Court should assume as true all "well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Porretto v. City of Galveston Park Bd. of Trustees,* 113 F.4th 469, 481 (5th Cir. 2024), *quoting Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir. 2008).

### III.   ARGUMENT

#### A. Plaintiff has standing to bring her claims.

Defendants first argue that Plaintiff has not pled standing to assert a claim because the citizen petition program was open only to registered voters in Arizona and other states, and Plaintiff is identified as merely a "citizen and resident of . . . Arizona." Doc. 1, Complaint ("Complaint") at ¶ 4. However, Defendants ignore Plaintiff's additional allegations that she signed the petition (which was only open to "eligible voters") and believed she had a chance of receiving $1,000,000. *Id.* at ¶¶ 31, 33. These allegations combined clearly imply that Plaintiff was an "Eligible Voter" as

defined by Defendants. However, should this Court disagree, this alleged deficiency is easily curable through an amended complaint, and Plaintiff requests leave to amend accordingly.

### B. Plaintiff has alleged an injury in fact.

As a condition of signing the petition, Plaintiff submitted her personal, private information (first and last name, email address, mailing address, and cell phone number) (hereinafter, "PII"). Complaint ¶ 32. Plaintiff's injury is therefore disclosure of her PII (by which Defendants profited) under the false promise of a chance to win $1,000,000. *Id.* at ¶ 34. Defendants claim this disclosure of PII does not constitute concrete harm. Defendants are incorrect.

Cases involving fraudulent lotteries or giveaways are hardly novel. In the typical case, "the injury arises out of the Lottery's misrepresentations regarding the availability of the represented prizes, which induced the purchase of scratch tickets." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1005 (Colo. 2008). In that scenario, the plaintiff's damages include "the money expended on lottery tickets." *Id.* Here, Plaintiff purchased the right to participate in Defendants' allegedly random giveaway not with money, but with something more valuable to Musk and AmericaPAC -- verified current contact information for a swing state voter in the months leading to an election.

High quality voter contact information is valuable, and there is a reason why Musk and AmericaPAC utilized the promise of massive giveaways to acquire it.[1] Voters needed to be convinced to provide that information with an enticing promise because they are otherwise hesitant to do so. Providing personal information to a political marketer comes with consequences. A person who provides their information will be subject to advertising and solicitation, both from the entity who collected the information and anyone else who later acquires it. Moreover, that

---

[1] *See e.g.* GoodParty.org offering access to voter contact information at a monthly charge; https://goodparty.org/run-for-office#pricing-section (last viewed February 17, 2025).

information may fall into malevolent hands, whether purposely, inadvertently, or through a criminal act. In short, once the information was disclosed to Musk and AmericaPAC, it was no longer under Plaintiff's control. As such, Plaintiff needed to be induced with a promise of value in order to provide it. The value of voter contact information is not theoretical or speculative. Such information is regularly purchased, and a qualified expert in political data brokerage can easily testify as to the specific monetary value of a swing state voter contact in the fall of 2024.[2] Yet at the dismissal stage, it suffices that Plaintiff has plausibly alleged the information provided to Defendants had value.

The loss of the monetary value of Plaintiff's proprietary information is by itself a legally cognizable harm. As alleged in Plaintiff's Complaint, her PII constituted "valuable consideration" and can be used by Defendant to profit thereby through use or sale. Complaint ¶ 34. In other words, Plaintiff's personal information has real monetary value, and that value was diluted when Defendant obtained it unlawfully.

Numerous courts have adopted this approach to analyzing the sufficiency of pleadings when it comes to damages stemming from disclosure of PII, such as in data breach cases. *See, e.g., In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.,* 603 F.Supp.3d 1183, 1204 (S.D. Fla. 2022); *Rodriguez v. Mena Hosp. Comm'n,* Case No. 2:23-cv-2002[1] (W.D. Ark. Nov 01, 2023) (aligning itself with the "trend of recognizing the lost property value of personal information.") (internal quotation marks omitted).

In other contexts, courts have found that the wrongful appropriation of personal data causes an injury which confers standing. For example, last year in *A.B. v. Google,* the plaintiffs "allege[d] that defendants obtained personal information from children under the age of 13 through Android

---

[2] *Id.*

apps in violation of COPPA and other common law privacy protections." *A.B. v. Google LLC*, 737 F. Supp. 3d 869, 875 (N.D. Cal. 2024). There, the court found that that "[p]rivacy harms involving personal data can constitute an injury to money or property sufficient to provide standing." *Id.* at 881; *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "plaintiffs who suffered a loss of their personal information suffered economic injury and had standing"); *Brown v. Google LLC*, 2021 U.S. Dist. LEXIS 244695, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021) (finding the collection of personal information through Google's data collection system as sufficient to qualify as damages for standing); *In re Meta Pixel Tax Filing Cases*, 2024 U.S. Dist. LEXIS 53062, 2024 WL 1251350, at *24 (N.D. Cal. Mar. 25, 2024) (noting that misappropriation of personal data can constitute economic injury).

The existence of this type of damage is frequently found in "circumstances where the defendants collected information that was itself monetized and used for commercial purposes." *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, Civil Action No. 19-md-2904, 2021 U.S. Dist. LEXIS 240360, at *47 (D.N.J. 2021); *see also In re In re NCB Mgmt. Servs.*, No. 23-1236, 2024 U.S. Dist. LEXIS 163260, at *27 (E.D. Pa. 2024) ("Courts have found PII valuable to a business that commoditizes it or receives an independent pecuniary benefit from holding the PII."). Thus, where a plaintiff alleged that defendant would use their PII for "the marketing of [its] other financial products," this was an "indicat[ion of] enrichment specific to the PII," which was sufficient to support an allegation that the information was valuable and that the defendant benefitted from the information. *In re Am. Fin. Res., Inc. Data Breach Litig.*, No. 222CV01757MCAJSA, 2023 U.S. Dist. LEXIS 108411, 2023 WL 3963804, at *8 (D.N.J. Mar. 29, 2023); *see also In re Yahoo! Inc. Customer Sec. Data Breach Litig.*, No. 16-2752, 2017 U.S. Dist. LEXIS 140212, 2017 WL 3727318, at *14 (N.D. Cal. Aug. 30, 2017) (holding that the

plaintiffs' PII was valuable to the defendant where it allegedly used the information for targeted advertising).

In one such case, *In re Marriott Int'l, Inc.,* a Maryland federal court noted that "the growing trend across courts that have considered this issue is to recognize the lost property value of this information." *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020). That case involved personal data provided by consumers to the Marriott hotel chain. The court held that the plaintiffs "adequately pled that the personal identifying information collected by Marriott has value," and that "Marriott recognizes the value of this information and collects it to better target customers and increase its profits." *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020). The court discussed the value of this information, explaining:

> Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services. To take a few examples, many businesses offer goods and services such as wifi access, special access to products, or discounts in exchange for a customer's personal information. Consumers choose whether to exchange their personal information for these goods and services every day. And here, plaintiffs allege that they gave Marriott their personal information as part of their exchange to stay at Marriott hotels …
>
> Neither should the Court ignore what common sense compels it to acknowledge – the value that personal identifying information has in our increasingly digital economy.

*In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020).

Plaintiff here also exchanged personal information for a service, namely, participation in a random giveaway, and Defendants acted wrongfully in securing that valuable personal information through deception. Defendants then used Plaintiff's information for their own commercial and political benefit. Thus, Defendants' actions not only denied Plaintiff the benefit of the bargain, but Defendants' actions also amount to misappropriation. The information provided by the voters was

not incidental to transaction, as Defendants "receive[d] an independent benefit from holding their PII." *In re In re NCB Mgmt. Servs.*, No. 23-1236, 2024 U.S. Dist. LEXIS 163260, at *28 (E.D. Pa. 2024). Plaintiff, much like the plaintiffs in *A.B. v. Google,* "recognize[s] that there is a market for their data," and the court held there was "a legally protected interest in their personal information." *A.B.*, 737 F. Supp. 3d at 882; 884. For that reason, the court in *A.B.* found that "plaintiffs have adequately pleaded that defendants were unjustly enriched by collecting plaintiffs' personal information and employing it to target advertisements to children." *Id.* at 885; *see also In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 808 (N.D. Cal. 2019) ("And even if the plaintiffs suffered no economic loss from the disclosure of their information, they may proceed at this stage on a claim for unjust enrichment…").

Plaintiff need not put a dollar value on her PII at this stage in the litigation—courts have rejected that notion. As the *Mednax* court observed, "in the data breach context, plaintiffs need not reduce their PHI or PII to terms of dollars and cents in some fictitious marketplace where they offer such information for sale to the highest bidder." 603 F.Supp.3d at 1204. The actual value of Plaintiff's lost data is a factual question to be determined at a later stage, and she is not required to allege an attempted sale of her personal information or that she was "forced to accept a decreased price for [her] information" to allege injury. *In re Marriott,* 440 F. Supp. 3d at 462 (the value of personal information "is not derived solely (or even realistically) by its worth in some imagined marketplace . . . but rather in the economic benefit the consumer derives from being able to purchase goods and services remotely and without the need to pay in cash or a check"). The loss of value of Plaintiff's personal data is a concrete harm that gives her standing to sue.

    **C. Plaintiff has pled facts sufficiently to state each cause of action.**

        *i. The facts related to fraud are pled with particularity.*

Rule 9 requires that allegations of fraud be pled with particularity. Fed. R. Civ. P. 9(b). This heightened pleading standard requires a plaintiff to plead not just a "short and plain statement," but additionally requires "the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted). Plaintiff's allegations clearly meet this standard.

First, Plaintiff has specified the statements which she contends are fraudulent, including the speaker, the time and the place. In fact, Plaintiff posted a link to the video of Elon Musk making the very statements she later specifically identifies. The video provides undeniable specificity as to who is the speaker as well as the date in the timestamp of the video. Plaintiff identifies the following statements, made at a October 19, 2024 rally and posted on the America PAC website (*see* Complaint ¶ 11): that those who sign the petition pledging support for "the Constitution, especially freedom of speech and the right to bear arms," they would be eligible to be selected "randomly" to win $1 million (Complaint ¶ 11); and "Musk said, 'we're gonna be awarding a million dollars, randomly, every day from now until the election,' because 'I figured, "How do we get people to know about it?"'" (Complaint ¶ 12).

Additionally, the Complaint describes a post by America PAC on X: "Every day from now until Election Day, one registered swing state voter who signs the petition will be selected to earn $1 MILLION," and included a link to the petition on America PAC's website. See America PAC (@America), "John received $1 MILLION . . . ." X (Oct 19, 2024, 11:58 P.M.), https://x.com/america/status/1847864967816511758." Here as well, Plaintiff could not be more clear about the speaker (America PAC), the location (social media site

X), and when this statement was made (October 19, 2024, at 11:58 pm). The link Plaintiff provides is therefore not necessary (since all elements of particular pleading are met), but its inclusion underscores how thorough Plaintiff was in pleading the facts related to fraud.

Plaintiff was also clear about which statements were false: "Defendants' statements indicating that individuals who signed the petition would be chosen at random to win $1,000,000 were false, and Defendants knew those statements were false at the time they were made." Complaint ¶ 29. Plaintiff alleged that she relied on the false statements ("Plaintiff signed the petition in reliance on statements by Musk and America PAC that in doing so she had a chance of receiving $1,000,000") and that she would not have signed the petition but for the false statements ("Had Plaintiff been aware that she had no chance of receiving $1,000,000, she would not have signed or supported the America PAC petition and would not have provided her PII to Defendants."). Complaint ¶ 33, 35.

By any reasonable measure, Plaintiff has pled her fraud claim with particularity and met the heightened pleading standards required under Rule 9. However, should this Court find that additional facts are required to meet the Rule 9 standard, Plaintiff requests leave to amend her complaint.

Buried in Defendants' argument about particularized pleading are two minor arguments: first, that the use of "Defendant" rather than the plural "Defendants" in two places in the Complaint makes it "impossible to respond" to the allegations of fraud; and second, that Musk's statements are not the official terms of the citizen petition program. Motion at 15. These arguments have a "throw everything at the wall and see what sticks" vibe, but Plaintiff will nevertheless address each argument.

As described fully *supra,* Plaintiff was abundantly clear about which Defendant said which fraudulent statement, providing time stamps down to the minute and links to the statements

themselves. What amounts to two typos (writing "Defendant" as singular rather than plural) does not undercut the well-pled allegations. However, in the alternative, Plaintiff requests leave to amend.

As to the second argument, Defendants acknowledge that Musk founded America PAC but imply that Plaintiff and other potential class members were unreasonable to rely on his statements as official terms of the citizen petition program. Motion at 15. First and foremost, this argument asks the Court to construe facts in their favor, a construction to which they are not entitled under the standard for assessing motions to dismiss. *See 1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Capital,* 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("[C]ourts have uniformly treated the issue of justifiable reliance as a question for the factfinder.") Additionally, reliance is measured by a plaintiff's "individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 (5th Cir.1990). It was reasonable for Plaintiff to rely on Musk's statements, as he is not only the founder of America PAC but was also acting as America PAC's spokesman at the time he made the statements.

*ii. Not all of Plaintiff's claims require particularized pleading.*

Defendants incorrectly state that all of Plaintiff's claims "sound in fraud" and therefore all of her claims require particularized pleading. Should this Court find that Plaintiff properly pled her fraud claim, this is a moot point. However, Plaintiff briefly responds to this argument should this Court find that Plaintiff did not plead her fraud claim properly.

In determining whether a claim sounds in contract or fraud or both, a court must determine whether the defendant's conduct gives rise to liability under fraud independently of the contract, and liability under contract independently of the alleged fraudulent conduct. *See Northwinds*

*Abatement, Inc. v. Emps. Ins. of Wausau,* 258 F.3d 345, 352 (5th Cir. 2001) ("The Texas Supreme Court has declared that if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Similarly, for an action to sound in fraud instead of breach of contract, [a defendant's] fraudulent conduct must give rise to liability independent of the contract.") (cleaned up).

Defendants' actions give rise to breach of contract, independently of their fraudulent conduct. Plaintiff alleged that she and Defendants entered into a contract based on Defendants' representations about signing the petition (Complaint ¶ 63), with Plaintiff's PII as consideration (Complaint ¶ 65). Plaintiff alleged that Defendants breached the contract by not choosing winners at random as promised (Complaint ¶ 67), and Plaintiff suffered damages by providing her PII (Complaint ¶ 68). None of these facts—which collectively form the basis for the breach of contract claim—allege fraudulent conduct. In other words, the elements for breach of contract are met without relying on Defendants' fraud. The heightened pleading standard therefore does not apply to Plaintiff's claim for breach of contract. However, should this Court disagree, Plaintiff again requests leave to amend her Complaint.

### *iii. Plaintiff has stated a claim for fraud.*

<u>False representation.</u> Defendants first argue that Plaintiff has not pled a plausible false representation because—in Defendants' words—a "random" selection is not irreconcilable with "pre-determined" selections. Motion at 16. This argument again asks the Court to make factual findings, specifically as to whether the word "random," as used by Musk in his speech on October 19, 2024, properly describes a lottery; but the facts must be construed in the non-movant's favor and so the Court should reject this interpretation. Further, Defendants' attempt to distinguish a lottery from what Musk described ("we're gonna be awarding a million dollars, randomly, every

day from now until the election", Complaint ¶ 12) borders on the absurd. Any reasonable person would agree that describing something as a "random choice" is virtually synonymous with "chance", which is the first element of a lottery. *See City of Fort Worth v. Rylie,* 649 S.W.3d 246, 250 (Tex. App. 2022) ("The tripartite view of what constitutes a lottery—chance, prize, and consideration—is ubiquitous.").

<u>Justifiable reliance.</u> Defendants next claim that Plaintiff cannot allege justifiable reliance because "a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." *Lewis v. Bank of Am. NA,* 343 F.3d 540, 546 (5th Cir. 2003). Defendants' Motion goes on to list several "red flags" that they claim Plaintiff should have interpreted as proof that their statements were false. This argument again requires the Court to make determinations of fact which are inappropriate at this stage—i.e., determine whether the circumstances which Defendant claims are red flags were sufficiently flagrant to undercut Plaintiff's reliance.

Further, even if the Court chooses to make such determinations, the "red flags" that Defendants identify are far more subtle than those identified in relevant case law which undercut a plaintiff's claim for justifiable reliance. For example, in *Grant Thornton LLP v. Prospect High Income Fund,* a relevant party (with a B.S. in finance and a master's degree in business) learned that the defendant was losing its line of credit which the party knew was "the lifeblood of the company," and yet he continued to buy bonds at a high price from the defendant. 314 S.W.3d 913, 923 (Tex. 2010). The court found that this situation did not support justifiable reliance. The facts in the instant case are incomparable to *Grant Thornton.* Plaintiff knew only that Musk and America PAC had promised to "randomly" pay out one million dollars per day, and that Defendants had chosen two individuals already for the payout at the time she signed the petition. Plaintiff cannot be expected to make inferences regarding the fact that both winners were present at the town halls when they were

announced. *See* Motion at 17. Nor should she be required to parse Defendants' statements for every possible construction of meaning—for example, the phrase "selected to earn $1 MILLION" does not foreclose the prior statement that individuals would be "randomly chosen."

<u>Damages.</u> Plaintiff clearly alleges damages in her Complaint. She states that she provided Defendants with her PII, which is valuable consideration (Complaint ¶¶ 35–36)—something she would not have done had she known Defendants' statements to be fraudulent.

### iv. *Plaintiff has stated a claim for breach of contract.*

Defendants again raise the argument that Plaintiff has not pled that she was an "Eligible Voter" for purposes of the contract. However, as argued above, she explicitly pled that she was a resident of Arizona (Complaint ¶ 4) and since Plaintiff successfully signed the petition (Complaint ¶ 31), her eligibility is implied. Should this Court disagree, this is easily amendable in an FAC and is not grounds for dismissal.

Defendants then argue that there was no valid contract because there was no "meeting of the minds." Motion at 18. This argument would foreclose any plaintiff from bringing both a claim for fraud and a claim for breach of contract, so on its face it is untenable. Additionally, when assessing "meeting of the minds," the court looks at expressed intent, not actual intent. *See In re Capco Energy, Inc.,* 669 F.3d 274, 280 (5th Cir. 2012) (citations omitted) ("The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind."). Defendants did not indicate to Plaintiff that their representations were false (see Section III.C.iii, "Justifiable Reliance," *supra*). Therefore, there was an objective meeting of the minds. However, in making this argument, Defendants concede that they "had no intention of operating a genuine lottery," despite making representations to that effect—essentially admitting to fraud. Motion at 18, Complaint ¶ 75.

Next, Defendants claim that there cannot be a valid contract because lotteries are illegal under Texas law and therefore any contract for the same would be void and unenforceable. Motion at 18. However, "[c]ontracts are presumptively legal, so the party challenging the contract carries the burden of proving illegality." *In re OCA, Inc.,* 552 F.3d 413, 422 (5th Cir. 2008), *citing Franklin v. Jackson,* 847 S.W.2d 306, 310 (Tex.App.—El Paso 1992, writ denied). The lottery operated entirely online, and Defendants have made no attempt to show that the lottery was based in Texas.

More importantly, in making this argument, Defendants again concede that they engaged in fraud. If the Defendants intended to operate a lottery, then Plaintiff's breach of contract claim stands. If Defendants did not intend to operate a lottery (as they claim), then they admit to fraud, since a lottery is what they described to eligible voters who signed the petition in reliance on their statements.

Finally, Defendants argue that Plaintiff hasn't pled damages because she "provides no basis to conclude that her situation is any different as a result [of Defendants' breach]." Motion at 19. The measure of damages in a breach of contract case is the "benefit of the bargain measure" in which "the injured party [is restored] to the economic position it would have occupied had the contract been performed." *Gensetix, Inc. v. Baylor Coll. of Med.,* 616 S.W.3d 630, 645 (Tex. App. 2020). Plaintiff provided her PII and received nothing in return; had the contract been performed, she would have had a chance to win $1 million. Plaintiff has therefore pled damages.

    iv.    *Plaintiff will dismiss her DTPA claim.*

Plaintiff maintains that her DTPA claim has merit; however, in the interest of efficiency and litigating only the strongest claims, Plaintiff agrees to dismiss her claim for violation of the DTPA.

**IV.    CONCLUSION**

Plaintiff has standing to bring these claims, which is borne out in her well-pleaded Complaint. Plaintiff has likewise pled each cause sufficiently and to the required standard under the Rules. Should this Court disagree, Plaintiff requests leave to amend her Complaint.

Date:  February 17, 2025

                Respectfully submitted,

                */s/ Jarrett Ellzey*
                Josh Sanford
                Texas Bar No. 24077588
                josh@sanfordlawfirm.com
                **SANFORD LAW FIRM PLLC**
                10800 Financial Centre Pkwy, Ste 510
                Little Rock, Arkansas 72211
                Telephone: (501) 221-0088
                Facsimile: (888) 787-2040

                Jarrett L. Ellzey
                Texas Bar No. 24040864
                jellzey@eksm.com
                Leigh S. Montgomery
                Texas Bar No. 24052214
                lmontgomery@eksm.com
                **EKSM, LLP**
                1105 Milford Street
                Houston, Texas 77006
                Phone: (888) 350-3931
                Fax: (888) 276-3455

                **ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 17th day of February, 2025

/s/ *Jarrett Ellzey*
Jarrett Ellzey