IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JACQUELINE MCAFERTY, *individually and on behalf of all others similarly situated*, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | 1:24-CV-1346-RP |
| ELON MUSK and AMERICA PAC, | § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is Defendants Elon Musk ("Musk") and America PAC's (collectively, "Defendants") motion to dismiss. (Dkt. 5). Plaintiff Jacqueline McAferty ("Plaintiff") responded in opposition, (Dkt. 7), and Defendants replied, (Dkt. 9). Defendants also filed a notice of supplemental authority. (Dkt. 18). After reviewing the parties' briefing, the record, and the relevant law, the Court grants in part and denies in part Defendants' motion.

## I. BACKGROUND

Plaintiff brings this putative class action to challenge the actions of Defendants in the lead up to the 2024 election. Musk founded America PAC, an independent expenditure only political action committee created to support "Secure Borders, Safe Cities, Free Speech, Sensible Spending, Fair Justice System and Self-Protection" and help elect Donald Trump as president. (Compl., Dkt. 1, ¶¶ 6–7, 13). In October 2024, America PAC launched a "Petition in Favor of Free Speech and the Right to Bear Arms," (the "Petition") on their website. (*Id.* ¶ 10). Visitors to America PAC's website could sign the Petition, which stated "The First and Second Amendments guarantee freedom of speech and the right to bear arms. By signing below, I am pledging my support for the First and Second Amendments." (Mot., Dkt. 5, at 3). To sign the Petition, one had to input their first and last

name, email, mailing address, and phone number and click "Sign Petition." (Compl., Dkt. 1, ¶¶ 20–21). Under cell phone number, the Petition said: "Will only be used to confirm you are the legitimate petition signer. No other purpose." (*Id.* ¶ 21). The website's Privacy Policy stated: "America PAC values your privacy and trust. Personal Identifying Information collected via the www.theamericapac.org will only be used to support America PAC's activities, and it will not be shared with any advertisers, political organizations, or third parties not directly affiliated with America PAC." (Mot., Dkt. 5, at 4).

America PAC encouraged registered voters who signed the Petition to refer others to do the same, "with an offer to pay individuals $47 for each registered voter referred who signed the [P]etition." (Compl., Dkt. 1, ¶ 10). This offer "was 'exclusively open to registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina' and 'expire[d] November 5.'" (*Id.* (quoting the Petition)).

At an October 19, 2024 town hall, Musk announced another effort to promote the Petition. He said, "I have a surprise for you. Which is that we're going to be awarding $1 million dollars, randomly, to people who have signed the [P]etition. Every day from now until the election." (*Id.* ¶ 12 (citing @America, X (Oct. 19, 2024, 11:06 PM), https://x.com/america/status/ 1847851986495881434 (video embedded in URL))). Musk said they were launching this initiative because "I figured, 'How do we get people to know about [the Petition]?'" Musk then called an audience member, John Dreher ("Dreher"), to the stage as the first $1 million recipient, and said, "By the way, John had no idea." When Dreher came onto the stage to accept an oversized check, Musk told Dreher, "The only thing we ask for the million dollars is that you be a spokesperson for the [P]etition." (*Id.*; *see also id.* ¶¶ 14–16).

Later that night, America PAC posted a video of this announcement on X with the caption: "ELON MUSK: 'I have a surprise for you. We are going to be awarding $1 MILLION to people

who have signed the [P]etition every day, from now until the election." (*Id.* ¶ 12). America PAC followed up later that night in a separate post: "John [Dreher] received $1 MILLION for signing America PAC's petition to support Free Speech & Right to Bear Arms. Every day from now until Election Day, one registered swing state voter who signs the petition will be selected to earn $1 MILLION." (*Id.* ¶ 17 (citing @America, X (Oct. 19, 2024, 11:58 PM), https://x.com/america/status/1847864967816511758)). This post was accompanied by a video of Dreher encouraging people to vote and talking about his experience of being given the $1 million check. Within the video was a chyron image that read: "John just won $1 million for signing this petition: Petition.TheAmerica.org" (*Id.*).

Musk made a similar X post that evening on his personal account, stating:

> Every day, from now through Nov 5, @America PAC will be giving away $1M to someone in swing states who signed our petition to support free speech & the right to bear arms! We want to make sure that everyone in swing states hears about this and I suspect this will ensure they do.

(*Id.* ¶ 18 (citing @ElonMusk, X (Oct 19, 2024, 11:25 PM), https://x.com/elonmusk/status/1847856712914555061)). The next day, on October 20, 2024, Musk posted again on X, "All you need to do is sign the @America petition in support of the Constitutional rights to free speech & bear arms to have a daily chance of winning $1,000,000!" @ElonMusk, X (Oct 20, 2024, 6:39 PM), https://x.com/elonmusk/status/1848147035607998575.

Another America PAC town hall was held on October 20, 2024, at which Musk announced a second $1 million recipient, Kristine Fiskell, who was in the audience that day. (Compl., Dkt. 1, ¶ 19). In total, America PAC awarded $1 million to nine individuals in October 2024, and Plaintiff alleges that each $1 million recipient "is featured on America PAC's website and X handle." (*Id.* ¶¶ 23–24). As of the filing of Plaintiff's complaint, over 1 million people had signed the Petition. (*Id.* ¶ 25).

In late October 2024, the District Attorney of Philadelphia filed a civil suit on behalf of the Commonwealth of Pennsylvania against Defendants alleging that the Petition was an illegal lottery and a violation of the Pennsylvania Consumer Protection Act. *See* Findings of Fact & Conclusions of Law, *Krasner v. Musk*, No. 241003509 (Pa. Phila. Cty. C.P. Nov. 12, 2024); *see also* Defs.' App'x, Dkt. 5-1, at 2–19.[1] The Philadelphia Court of Common Pleas held a hearing on the case on November 4, 2024, where the court heard sworn testimony from, among others, America PAC's representative Chris Young ("Young"), the organization's director and treasurer. *Id.* at 3. Young testified that those selected to earn $ 1 million were not chosen by random chance but instead America PAC looked for individuals who signed the Petition that it thought would be a good fit to represent the organization as spokespeople. *Id.* at 6. Based on this testimony, the complaint alleges that recipients were not chosen by chance but instead chosen based on their personal stories and thereafter signed a contract with America PAC to be their spokesperson. (Compl., Dkt. 1, ¶¶ 27–28).

Plaintiff alleges she is a citizen and resident of Maricopa, Arizona. (*Id.* ¶ 4). She signed the Petition on October 20, 2024, providing her first and last name, email address, mailing address, and cell phone number (hereinafter, "personally identifiable information" or "PII"). (*Id.* ¶¶ 31–32). Plaintiff alleges that she signed the Petition "in reliance on statements by [Defendants] that in doing so she had a chance of receiving $1,000,000." (*Id.* ¶ 33). She asserts that had "she been aware that she had no chance of receiving $1,000,000, she would not have signed or supported the [Petition] and would not have provided her PII to Defendants." (*Id.* ¶ 35). She states that her signature and

---

[1] The Court considers the Findings of Fact and Conclusions of Law as a document incorporated into Plaintiff's complaint by reference. (*See* Compl., Dkt. 1, ¶¶ 26–28); *see, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (In considering a 12(b)(6) motion, courts "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (cleaned up) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993).

her PII "were given as valuable consideration for a chance to receive the $1,000,000" and that Defendants profited off her PII. (*Id.* ¶¶ 34–35). Plaintiff accuses Defendants of defrauding her and others who signed the Petition by seeking their PII when they never had an actual chance of receiving $1 million. (*Id.* ¶ 36).

Plaintiff filed her complaint on November 5, 2024 on behalf of herself and a proposed class, consisting of all U.S. citizens who signed the Petition. (*Id.* ¶ 37). She brings three damages claims: common law fraud, breach of contract, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). (*Id.* ¶¶ 52–77). She also brings a claim for injunctive relief, seeking a Court order "requiring Defendant[s] to destroy all [PII] Plaintiff and the proposed class members provided to Defendants." (*Id.* ¶ 83). Defendants have moved to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, alleging Plaintiff does not have standing to assert her claims. (Dkt. 5). They also move to dismiss the complaint under Rule 12(b)(6), arguing that Plaintiff has not pled her claims with particularity pursuant to Rule 9(b) and has failed to state a claim on all counts. (*Id.*).

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

"Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B. Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338

(5th Cir. 2008) (citations and internal quotation marks omitted). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## III. DISCUSSION

The Court first acknowledges that in her response to the motion to dismiss, Plaintiff agrees to dismiss her DTPA claim. (Resp., Dkt. 7, at 14). Accordingly, the Court will dismiss the DTPA claim and focus its analysis on the remaining claims for fraud and breach of contract. The Court begins with Defendants' request to dismiss this case for lack of standing under Rule 12(b)(1) before turning to Defendants' request to dismiss the case for failure to state a claim. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

### A. Standing

Article III of the Constitution limits the jurisdiction of federal courts to "cases and controversies." U.S. Const. art. 3, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Defendants' 12(b)(1) motion centers on the first element of standing: the requirement that a plaintiff show she has suffered a concrete injury in fact.[2] "[C]ertain harms readily qualify as concrete injuries under Article III." *TransUnion*, 594 U.S. at 425. "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* Various intangible harms can also satisfy this requirement, but only if they have a "'close relationship' to harms 'traditionally' recognized as providing a basis for lawsuits in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 340).

Plaintiff alleges that she submitted her PII to Defendants as valuable consideration in exchange for participation in a random giveaway and Defendants acted wrongfully in securing that valuable PII through alleged deception. She asserts that her PII has real monetary value and that value was diluted when Defendants obtained it unlawfully. Plaintiff argues that Defendants' actions denied Plaintiff the benefit of the bargain because while Defendants were able to use Plaintiff's information for their own benefit, Plaintiff did not receive what she bargained for—a random chance to win $1 million. She argues that this failure to receive the benefit of her bargain constitutes a tangible, economic harm. (Resp., Dkt. 7, at 3–7). In response, Defendants contend that Plaintiff's theory of standing fails because it does not have legal support from courts within the Fifth Circuit and because Plaintiff has not alleged facts to support it. (Reply, Dkt. 9, at 3–9). The Court agrees with Plaintiff.

Plaintiff's injury is properly analogized to those recognized by courts in fraudulent lottery cases, where "the injury arises out of [a lottery's] misrepresentations regarding the availability of the

---

[2] Defendants also argue that Plaintiff has not properly alleged standing because she has not pleaded that she was eligible to participate in the Petition program. (Mot., Dkt. 5, at 7). The Court disagrees. Plaintiff pleads the Petition program was "exclusively open to registered voters in" specific states, such as Arizona. (Compl., Dkt. 1, ¶ 10). Defendants take issue with the fact that Plaintiff pleaded only that she is "a citizen and resident of . . . Arizona," (*id.* ¶ 4), but not that she was a registered voter in Arizona. However, Plaintiff also alleged that she signed the Petition and believed she had a chance of receiving $1 million. (*See id.* ¶¶ 31, 33). These allegations give rise to a plausible inference that Plaintiff was an eligible voter who has standing to assert her claims.

represented prizes, which induced the purchase of scratch tickets." *See Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1005 (Colo. 2008). In those cases, the plaintiff's damages include "the money expended on lottery tickets." *Id.* at 1006. Here, Plaintiff purchased the right to participate in Defendant's alleged giveaway not with money but with her PII. The question then becomes whether Plaintiff has sufficiently alleged that her PII had value. The Court finds she has.

In her complaint, Plaintiff alleges that her PII was "valuable consideration" that Defendants can "profit off" through use or sale. (Compl., Dkt. 1, ¶ 34).[3] She reasserts in her response that Defendants have "used Plaintiff's information for their own commercial and political benefit." (Resp., Dkt. 7, at 6). Defendants argue that Plaintiff has not adequately explained the value of her PII or exactly how Defendants have benefitted from the use of it. (*See* Reply, Dkt. 9, at 5–6, 9). But the value of Plaintiff's PII is plausibly inferred from the face of Plaintiff's complaint. Plaintiff's PII was valuable because it was the verified contact information for a swing-state voter, given to a political action committee only weeks before a federal election. While Plaintiff has not specifically alleged how Defendants used her PII, such action can be inferred from the Petition itself, which states that the PII "will only be used to support America PAC's activities" and also could be shared with "advertisers, political organizations, or third parties [] directly affiliated with America PAC." (Defs.' App'x, Dkt. 5-1, at 45). Further, the value of voter contact information is not theoretical or speculative because voter contact information is a product that is regularly purchased by campaigns. (*See* Resp., Dkt. 7, at 3–4 & nn. 1–2). Plaintiff need not put a specific dollar value on her PII at this stage in the litigation. Instead, a qualified expert in political data brokerage could testify at trial as to what the specific monetary value of a swing state voter's contact information was in fall 2024.

---

[3] Plaintiff also alleges that "Defendant[s] profited off the valuable consideration by Plaintiff and the Class by driving traffic and attention to Musk's X Platform." (Compl., Dkt. 1, ¶ 33). Because Plaintiff in her response did not base her standing argument on this allegation, the Court does not consider the allegation in its standing analysis.

Indeed, "[c]ourts have found PII valuable" in instances like this where it was given "to a business that commoditizes it or receives an independent pecuniary benefit from holding the PII." *In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp. 3d 262, 278 (E.D. Pa. 2024) (collecting cases); *see also, e.g.*, *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, No. CV-19-MD-2904, 2021 WL 5937742, at *10 (D.N.J. Dec. 16, 2021) (noting that courts have recognized injury where "defendants collected information that was itself monetized and used for commercial purposes"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at 13–14 (N.D. Cal. Aug. 30, 2017) (holding that the plaintiffs' PII was valuable to the defendant where it allegedly used the information for targeted advertising). "[T]he growing trend across courts that have considered this issue is to recognize the lost property value of this information." *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020). Courts have come to this conclusion after recognizing "what common sense compels [them] to acknowledge – the value that [PII] has in our increasingly digital economy." *Id.* at 462.

In this case, the Court need not rely on common sense to understand that Defendants found Plaintiff's PII valuable because Defendants themselves created a market for Plaintiff's PII. Aside from the $1 million award, the Petition encouraged those who signed the Petition to refer others to sign it and offered $47 "for each registered voter referred who signed the [P]etition." (Compl., Dkt. 1, ¶ 10). This offer suggests that Defendants themselves believed that every eligible voter's PII was worth *at least* $47 because that was the amount Defendants were willing to pay to obtain it. It is disingenuous for Defendants to argue that Plaintiff's PII has no value when Defendants went through so much effort—two monetary programs, multiple town halls, several social media posts—to acquire it. Plaintiff has sufficiently alleged that Defendants valued the PII and that she lost that value by giving Defendants her PII without getting what she bargained for in return—a random chance to win $1 million.

Defendants urge this Court to find that there is no standing in this case because of the Court's decision in *In re ESO Solutions, Inc. Breach Litigation* last year. No. 1:23-CV-1557-RP, 2024 WL 4456703 (W.D. Tex. July 30, 2024). *In re ESO* involved a punitive class action where a group of patients filed suit against ESO—a software company that provides services for hospitals and healthcare facilities where plaintiffs received care—for a data breach that allegedly exposed the patients' PII and personal heath information to the dark web. *Id.* at *1. The plaintiffs brought claims for negligence, breach of a third-party beneficiary contract, unjust enrichment, and violations of the deceptive trade practices acts of several states. *Id.* ESO moved to dismiss the suit, alleging that the plaintiffs had not alleged a concrete injury solely by having their private information exposed to third parties. *Id.* The plaintiffs asserted several theories of standing, including diminution of value and loss of benefit of the bargain, but the Court rejected both theories based on the plaintiffs' inadequate allegations.

Under a diminution of value theory, the plaintiffs alleged that their PII "which has an inherent market value in both legitimate and dark markets, ha[d] been damaged and diminished by its compromise and unauthorized release." *Id.* at *6. The Court began its analysis by noting that "courts nationwide are split on whether diminution of PII constitutes a concrete injury." The Court recognized that while other district courts have recognized this theory of standing, "district courts in Texas have been more skeptical." *Id.* The Court went on to hold that "[e]ven if diminished PII was cognizable in the Fifth Circuit, Plaintiffs do not plausibly show their PII has diminished in value" in this case because the plaintiffs had not alleged "that they attempted to or would have ever sold their PII," "that if they now attempted to sell their PII, they would be forced to accepted a diminished price for it," or that "their information is (or was) being actively distributed on the dark web or any other marketplace for private information." *Id.* at *7.

As for their benefit of the bargain theory of standing, the plaintiffs alleged that they agreed to provide their medical information to ESO in exchange for ESO agreeing to safeguard that information; because that information was leaked, the plaintiffs argued they had lost the value of their bargain with ESO. *See id.* at *7. The Court found this theory unpersuasive for two reasons. First, the plaintiffs had failed "to allege the price they paid to their health providers—let alone any sum to be used for data security" which undercut the argument that the plaintiffs had paid a specific amount of money to ESO or their healthcare providers in exchange for protection of their PII. *Id.* (citing *Williams v. Bienville Orthopaedic Specialists, LLC*, 737 F. Supp. 3d 411, 422 (S.D. Miss. 2024)). Second, the Court took issue with the fact that the plaintiffs were alleging a contractual injury for their tort claims when there was no allegation that the plaintiffs directly contracted with ESO. The Court observed that "if Plaintiffs have any relevant contract, it is with the healthcare providers who are ESO's clients, not with ESO itself." *Id.*

Though Defendants argue the instant case is controlled by *In re ESO*, the Court finds the two cases distinguishable. Defendants interpret Plaintiff's briefing as advocating for a diminution of value theory of standing—e.g., Plaintiff's PII is now less valuable in the future because it was allegedly taken unlawfully in this instance—but that understanding of injury is more applicable in instances of data breaches where PII is leaked and can be distributed to innumerable third parties. The alleged injury in those cases is typically privacy concerns about leaked PII and the monetary concerns of being unable to sell one's PII at the same value as one could have had the data breach not occurred. *See, e.g.*, *In re Marriott*, 440 F. Supp. 3d at 457–62 (recognizing injury where as a result of a data breach, plaintiffs alleged imminent risk of identity theft and diminished value of PII); *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1204 (S.D. Fla. 2022) (similar). The theory is less applicable in breach of contract cases like this one, where there is no allegation of dissemination of information to third parties but rather an allegation that Defendants

were unlawfully enriched by using that information themselves. The Court's discussion of diminution of value in *In re ESO* is thus not controlling here, and the fact that Plaintiff has not alleged specific attributes of a diminution of value theory—that she has attempted or would have sold her PII, that the PII has lesser value now if she did try to sell it, or that the PII was distributed to third parties—is not determinative of her standing in this case.

Instead, the Court understands Plaintiff to be advocating for a lost benefit of the bargain theory of standing—i.e., that her PII was diluted in value because she gave away the value of her PII for nothing, without receiving the benefit of her alleged bargain with Defendants. Courts, like this one in *In re ESO*, have at times been skeptical of this theory of standing in the data breach context. *See, e.g.*, *Williams*, 737 F. Supp. 3d at 422 (rejecting lack of benefit of the bargain theory where plaintiffs did not allege they paid a certain amount of money to defendants for protection of their information); *In re Am. Fin. Res., Inc. Data Breach Litig.*, No. 2:22-CV-01757-MCA-JSA, 2023 WL 3963804, at *5 n.7 (D.N.J. Mar. 29, 2023) (finding lost benefit of the bargain theory unpersuasive in data breach case because "[a]n individual who bargains for data security and whose data is never accessed by third parties has received exactly what she paid for" (internal quotation marks omitted)) However, other courts have recognized that a lost benefit of the bargain can confer standing in cases where the plaintiff has alleged that she had a contractual relationship with the defendant and the plaintiff alleged that the defendant's misdeeds diminished the value of their bargain. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903 (8th Cir. 2016) (in a data breach and breach of contract case, finding plaintiff alleged injury in the "form of devaluation of his Game Informer subscription in an amount equal to the difference between the value of the subscription that he paid for and the value of the subscription that he received, *i.e.*, a subscription with compromised privacy protection); *see also, e.g.*, *In re Marriott*, 440 F. Supp. 3d at 462–466; *In re Yahoo! Inc.*, 313 F. Supp. 3d at 1130.

The Court finds that the lost benefit of the bargain theory of standing is cognizable in the current case because unlike in *In re ESO*, Plaintiff here is alleging that she directly contracted with Defendants. Therefore, it is proper for Plaintiff to allege a contractual injury for her breach of contract claim. This type of injury is also cognizable for Plaintiff's fraud claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998) ("Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received.") (citations omitted); *see also* Restatement (Second) of Torts § 549(1) (1977) (stating that the plaintiff in a fraudulent misrepresentation action can receive in damages "the difference between the value of what he has received in the transaction and its purchase price or other value given for it" and "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation"). Further, unlike the plaintiffs in *In re ESO*, Plaintiff has alleged the specific amount she gave in exchange for a random chance to win the $1 million—her PII, the value of which can be determined later but seems to be at least $47 in the specific market Defendants created for it. Plaintiff's specific allegations, here, differentiate her case from *In re ESO* and other data breach cases relied upon by Defendants and support a finding of standing in this instance.

The Court is satisfied that Plaintiff has sufficiently alleged a concrete injury from Defendants' alleged fraud and breach of contract—the loss of the benefit of the bargain Plaintiff struck with Defendants when she signed the Petition, i.e., the value of her PII. Though Defendants do not challenge the other standing requirements, the Court finds those are satisfied as well: Defendants' alleged fraud and breach of contract caused Plaintiff's injury and that injury would be redressed by awarding Plaintiff damages for the amount Plaintiff lost in entering the bargain with

Defendants. Accordingly, the Court finds that Plaintiff has standing to assert her fraud and breach of contract claims and denies Defendants' Rule 12(b)(1) motion to dismiss Plaintiff's claims for lack of subject matter jurisdiction.

### B. Failure to State a Claim

The Court now turns to Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's claims for failure to state a claim. The Court considers Defendants' arguments as to Plaintiff's fraud and breach of contract claims in turn.

#### 1. Fraud

Defendants first argue that Plaintiff's fraud claim should be dismissed for failure to plead with particularity pursuant to Rule 9(b). (Mot., Dkt. 5, at 13–16). Rule 9 requires that a party "alleging fraud . . . must state with particularity the circumstances constituting fraud," except that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Allegations of fraud must . . . meet a higher, or more strict, standard than the basic notice pleading required by Rule 8" because, among other things, "unsubstantiated charges of fraud can irreparably damage a defendant's reputation." *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir. 1994) (cleaned up). The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (internal quotation marks omitted).

The Court is satisfied that Plaintiff has met the higher standard imposed by Rule 9(b) by identifying the statements which she contends are fraudulent, the speaker of those statements, and the time and place where those statements were made. Plaintiff's complaint includes the primary statement from Musk that she claims is fraudulent—namely, that he said that America PAC would award $1 million "randomly" once a day to someone who signed the Petition. (Compl., Dkt. 1, ¶¶

11, 12). The complaint includes a link to the video of the town hall where Musk made these statements, which identifies the location and time where the statements were made. (*Id.*).[4] The complaint also identifies X posts made by America PAC and Musk that amplified Musk's town hall announcement. (*Id.* ¶¶ 17–18). The speaker, location (the social media site X), and time of these statements are clear from Plaintiff's reference to the posts. Further, Plaintiff explicitly stated which statements were allegedly false: "Defendants' statements indicating that individuals who signed the petition would be chosen at random to win $1,000,000 were false, and Defendants knew those statements were false at the time they were made." (*Id.* ¶ 29). She also explained that those statements were allegedly false "because [Defendants] have since admitted that the winners were pre-determined." (*Id.* ¶ 55; *see also* ¶¶ 27–28, 56, 64, 67). The Court finds that Plaintiff has sufficiently pleaded her fraud claim under Rule 9(b).[5]

Next, Defendants argue that Plaintiff has not sufficiently stated a claim for fraud. To prevail on her fraud claim, Plaintiff must prove:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323 (Tex. 2011). Plaintiff has adequately alleged all six elements. First, she alleges that Defendants' representations—that by

---

[4] Defendants argue that Musk's statements cannot be attributed to America PAC and were not the official terms of the Petition program, but Plaintiff has alleged that Musk made representations on behalf of the PAC, (Compl., Dkt. 1, ¶ 7), and at this stage of the litigation, the Court must accept that allegation as true.
[5] Defendants argue that Plaintiff's breach of contract claim is also subject to Rule 9(b)'s heightened pleading standard because it arises from the same allegedly fraudulent conduct and should therefore also be dismissed for failure to plead with particularity. (Resp., Dkt. 5, at 14). Plaintiff disputes that her breach of contract is subject to Rule 9(b). (Resp., Dkt. 7, at 10). The Court does not reach the issue of whether the Rule 9(b) standard applies to Plaintiff's breach of contract claim because even if the heightened pleading standard applied, for the reasons above, the breach of contract claim would be sufficiently pled with particularity.

signing the Petition, Plaintiff and others were eligible to randomly win $1 million—were material because "a reasonable person would attach importance to such a representation" given the "large sums of money involved." (Compl., Dkt. 1, ¶ 54). Second, she alleges that "Defendants' representations were false because [Defendants] have since admitted that the winners were pre-determined." (*Id.* ¶ 55). Third, she alleges that Defendants knew the representations were false when they were made, (*id.* ¶ 56), and fourth, that Defendants intended that Plaintiff and others would sign the Petition based on the representations, (*id.* ¶ 57). Fifth, Plaintiff states that she signed the Petition and gave Defendants her PII in reliance on Defendants' statements and asserts that she would not have done so if she had known that she did not have a chance to win the $1 million. (*Id.* ¶¶ 33, 35, 58). Last, she asserts that she suffered damages by giving her PII to Defendants. (*Id.* ¶ 60).

Defendants argue that Plaintiff has not properly alleged three of those elements. They first contend that Plaintiff has not pled a plausible false representation because, in Defendants' view, the PAC's decision to "pre-determine" recipients is consistent with the notion that the recipients were selected "randomly." (Mot., Dkt. 5, at 16–17). Defendants' argument on this ground is wholly unpersuasive. As Defendants themselves point out, a common definition for "randomly" is "lacking a definite plan, purpose, or pattern." (*Id.* at 16 (citing *Random Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/randomly)). If Defendants pre-determined the $1 million recipients based on their personal stories rather than chance, as Plaintiff has alleged, then the recipients were obviously not chosen in a way that "lack[ed] a definite plan, purpose, or pattern." Whether Musk's statement falsely or accurately described the way the $1 million recipients were selected will be elucidated through discovery. For now, Plaintiff has plausibly alleged a false representation.

Defendants next argue that Plaintiff cannot allege justifiable reliance because "a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted."

(Mot., Dkt. 5, at 17 (quoting *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010))). Defendants list several "red flags" that they claim Plaintiff should have interpreted as proof that the Petition program was not a random lottery: (1) in the same video where Musk uses the word "randomly" to describe the selection process, he also states two minutes later that the payment was conditioned on the requirement that the recipient "be a spokesperson for the [P]etition," (*see* Compl., Dkt. 1, ¶ 16); (2) as of October 20, when Plaintiff signed the Petition, the only two recipients who had been declared were present at the town halls where they were announced; and (3) in America PAC's X post sharing the Musk townhall announcement, it stated that the $1 million recipients were being "selected to earn" the money, (*see id.* ¶ 17). Defendants ask the Court to conclude that "no reasonable person could have relied upon the (undisputed) assertions" in Musk's announcement and the subsequent X posts. (Reply, Dkt. 9, at 10). The Court cannot do so.

While these supposed "red flags" are relevant to an ultimate determination of whether Plaintiff justifiably relied upon Musk's assertion that recipients would be chosen randomly, it would be inappropriate to conclusively decide this issue on a motion to dismiss. All that the Court is tasked with now is determining whether Plaintiff has plausibly alleged justifiable reliance, construing all facts in her favor. Doing so, the Court finds it is plausible that she would rely on Musk's assertion that $1 million would be given out randomly notwithstanding his or America PAC's later statements. Plaintiff's justifiable reliance is further plausible in light of other possibly misleading words Defendants used to describe the Petition program: (1) Defendants would be "*awarding* $1 million" to those who signed the Petition, (Compl., Dkt. 1, ¶ 12 (Musk townhall video and America PAC X post)); (2) John Dreher had "*won* $1 million for signing the [Petition]" (*id.* ¶ 17 (chyron in America PAC video)); (3) every day, America PAC would be "*giving away*" $1 million to someone who signed the Petition, (*id.* ¶ 18 (Musk X post)); and (4) "All you need to do is sign the [Petition] . . . to have a

*daily chance of winning* $1,000,000" (Musk X post dated Oct. 20, 2024, *supra*) (emphases added). For these reasons, the Court is satisfied that Plaintiff has plausibly alleged justifiable reliance.

Defendants finally argue that Plaintiff has failed to allege damages for her fraud claim, relying on the same arguments they made opposing Plaintiff's standing. (Mot., Dkt. 5, at 17). As the Court has already found, Plaintiff's injury was that she allegedly provided Defendants her PII as consideration for a chance to win $1 million—something she would not have done had she known that Defendants' representations of the program were fraudulent. Plaintiff may recover the value of her PII as damages, and as such she has plausibly alleged damages for the fraud claim.

Plaintiff has plausibly alleged that Defendants defrauded her by inducing her to give them her PII under the false representation that she had a random chance to win $1 million. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's fraud claim.

### 2. Breach of Contract

Defendants next argue that Plaintiff has not sufficiently pled all elements of her breach of contract claim. A plaintiff asserting a breach of contract claim must prove "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n.21 (Tex. 2018). To prove the first element of existence of a valid contract, a plaintiff must establish, among other things that "the parties had a meeting of the minds on the essential terms of the contract." *Id.*

Defendants argue that Plaintiff has not alleged the existence of a valid contract because there was no meeting of the minds on the essential terms of said contract. Defendants argue that Plaintiff's allegation that "Defendants knew all along the winners were pre-determined, and had no intention of operating a genuine lottery as Defendant represented it would," (Compl., Dkt. 1, ¶ 75),

"forecloses a showing of mutual assent to terms that Plaintiff claims she and Defendants agreed to," (Mot., Dkt. 5, at 18). However, when assessing whether there was a meeting of the minds, the relevant analysis is expressed intent, not actual intent. *See In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012) ("The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind.") (quoting *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App. 1999)). Defendants did not indicate to Plaintiff what their subjective intent was in running the Petition program. All Plaintiff knew about the program was what Defendants objectively communicated, which included representations that recipients were to be chosen "randomly." As explained above, it is plausible that Plaintiff justifiably relied on those statements to believe that Defendants were objectively offering her the chance to enter a random lottery—even if that is not what they subjectively intended to do. Plaintiff alleges she accepted the terms of that offer by signing the Petition and giving Defendants her PII as consideration. Therefore, Plaintiff has alleged a plausible, objective meeting of the minds.

Defendants also contend that Plaintiff has not alleged a valid contract because lotteries are illegal under Texas law, (*see* Tex. Const. art. III, § 47), and therefore any contract to create a lottery would be void and unenforceable. (Mot., Dkt. 5, at 18 (citing *In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008))). However, "[c]ontracts are presumptively legal, so the party challenging the contract carries the burden of proving illegality." *In re OCA, Inc.*, 552 F.3d at 422 (citing *Franklin v. Jackson*, 847 S.W.2d 306, 310 (Tex. App.—El Paso 1992, writ denied)). Based on Plaintiff's complaint, it appears that the Petition program operated mostly online, except for Musk's two town halls. There have been no allegations demonstrating that the program was based in Texas. As such, Defendants have not met their burden in showing that the contract would have been void under Texas law. Plaintiff has plausibly alleged the existence of a valid contract.

Defendants finally argue that Plaintiff has not plausibly alleged damages because she "provides no basis to conclude that her situation is any different as a result" of Defendants' breach. (Mot., Dkt. 5, at 19). "The normal measure of damages in a breach-of-contract case is the expectancy or benefit-of-the-bargain measure," in which the goal is "to restore the injured party to the economic position it would have occupied had the contract been performed." *Parkway Dental Assocs., PA v. Ho & Huang Props., LP*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Here, had the contract been performed as alleged, Plaintiff would have received a random chance to win $1 million, which may be difficult to quantify as concrete damages. However, another possible measure of damages in breach of contract cases is "the reliance measure of damages" which seeks to "put the injured party in as good an economic position as it would have occupied had the contract not been made." *Id.* at 607–08. Under a reliance measure, Plaintiff could recover the value of her PII, as if she had never given it to Defendants as part of the parties' alleged contract. Therefore, Plaintiff has plausibly alleged damages for her breach of contract claim.

Plaintiff has plausibly alleged that Defendants breached a contract when they did not give her a random chance to win $1 million after she signed the Petition and gave Defendants her PII. Accordingly, the Court also denies Defendants' motion to dismiss Plaintiff's breach of contract claim.[6]

---

[6] Because the Court allows Plaintiff's fraud and breach of contract claims to proceed, the Court also denies Defendants' request to dismiss Plaintiff's claim for injunctive relief. (Mot., Dkt. 5, at 21).

### IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' motion to dismiss, (Dkt. 5), is

**GRANTED IN PART AND DENIED IN PART**. The motion is granted as to Plaintiff's DTPA

claim, which is **DISMISSED**. The motion is denied as to Plaintiff's fraud and breach of contract

claims.

**SIGNED** on August 20, 2025.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE