**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Appx. 1    Petition in Favor of Free Speech and the Right to Bear Arms (AMPAC0001836)

Appx. 2    Excerpts of the Deposition of Chris Young February 3, 2026

Appx. 3    Excerpts of the Deposition of Jacqueline McAferty January 20, 2026

Appx. 4    X Post dated October 19, 2024 (AMPAC001175)

Appx. 5    X Post dated October 20, 2024 (AMPAC001176)

Appx. 6    X Post dated October 20, 2024 (AMPAC001187)

Appx. 7    "Earn $1,000,000" Petition Page (AMPAC0001855)

Appx. 8    Plaintiff's Text Message (MCAFERTY_000001–000002)

Appx. 9    Declaration of Sceusa

Appx. 10    America PAC Privacy Notice (AMPAC0001999)

# Appx. 1
# Petition in Favor of Free Speech and the Right to Bear Arms (AMPAC0001836)

**🇺🇸 AMERICA 🇺🇸**

# Petition in Favor of Free Speech and the Right to Bear Arms

The First and Second Amendments guarantee freedom of speech and the right to bear arms. By signing below, I am pledging my support for the First and Second Amendments.

**In appreciation for your support, you will receive $47 for each registered voter you refer that signs this petition.**

Our goal is to get 1 million registered voters in swing states to sign in support of the Constitution, especially freedom of speech and the right to bear arms. This program is exclusively open to registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina. Expires October 21.

**First Name** *

First Name

**Last Name** *

Last Name

**Email Address** *

Email Address

**Cell Phone Number** *
Will only be used to confirm you are the legitimate petition signer. No other purpose.

Cell Phone Number

**Mailing Address** *

Street Address

**Use Manual Address**

**Did someone refer you?**

**Email or Cell Phone Number**

Email or Cell Phone Number

**SIGN PETITION** ⟩

Each person may only sign this petition once. Eligible people may only list one eligible person as their referrer. Signing the petition on behalf of another person is not permitted. Before payment is made, America PAC will verify the accuracy of all information of the referrer and referee. Payments of $600 or more will require the referrer to provide a signed IRS W-9 so an IRS 1099 can be issued. To be eligible, both the referrer and petition signer must be registered voters of Arizona, Georgia, Michigan, Nevada, North Carolina, Pennsylvania, or Wisconsin.

**CONFIDENTIAL**                                                                                          AMPAC0001836

# Appx. 2
# Excerpts of the Deposition of Chris Young
# February 3, 2026

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JACQUELINE MCAFERTY,   :
individually and on behalf of :
others similarly situated,  :
  Plaintiff,      :
             :
  vs.         : No 1:24-cv-1346
             :
             :
ELON REEVE MUSK & AMERICA PAC, :
  Defendants.     :


Oral and videotaped deposition of
Christopher Young
February 3, 2026


    Oral and videotaped deposition of Christopher Young, produced as a witness at the instance of Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on February 3rd, 2026, from 10:01 a.m. to 1:47 p.m., before Jennifer Ivanic, Notary Public, in and for the State of Texas, reported by machine shorthand method, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



Page 10

A. Yes, several.

Q. Okay. Do you mind sharing those names of the super PAC -- I mean, prior to your position with America PAC?

A. Again, I -- I've worked with dozens and dozens of super PACs, some of which I probably forget. Whether it was -- whether it was facilitating donor interactions, or it was actually, you know, being contracted or a vendor to super PACs or C4s, there were a number.

So I facilitated donor relationships with groups like CLF, SLF, which is congressional leadership funds, senate leadership fund, which are large national organizations. I've also done state-based specific super PACS like Engage Texas and others that focused on state-level work.

Q. Is it fair to say that this is your -- this is your first position as a treasurer of a super PAC?

MS. LINTHORST: Objection. Mischaracterizes the witness's testimony.

Q. (BY MS. VOLPE) Is it fair to say that this is -- I mean, I guess, is this the first position you've had as a treasurer of a super PAC?

A. I believe it's the first time I've served as a treasurer for a 527.

Page 11

Q. Okay. And can you give me a -- kind of a -- and I'm -- excuse my ignorance about PACs and election and all -- but I just want to get some -- some highlights on what your role is and, you know, what does a treasurer do for a super PAC?

A. Right. So as treasurer for the super PAC, the way that I do the job responsibility is -- it is to be accountable for every dollar that comes in and out of these organizations, and to make sure that those are, you know, acting as a fiduciary, spent wisely and in the best interest of the donors and that they stay on mission and that vendors are held accountable throughout that process. And, ultimately, that we properly categorize and report everything back to the Federal Election Commission.

Q. And can you give me kind of a day to day, what you do on a daily basis? I mean, I know you're responsible for -- you know -- but what does your average day look like as a treasurer?

A. Treasurer responsibilities are predominately related to when the -- when the filings are due. So in -- in your capacity as a treasurer, traditionally that is -- is not -- those duties aren't as time demanding until you're coming up to the FEC reports, whether you file monthly or quarterly. That's when

Page 12

you're starting to review the reports that your compliance firm is putting together and making sure that they are valid and accurate.

Q. Okay. And do you manage any of the -- it sounds like there's multiple people. I mean, can you describe, again, like the day-to-day? Do you make phone calls to multiple people? Do you have to draft anything? I mean, just -- I mean, what you're describing sounds very limited on a day-to-day basis, but if you could expand on, you know, like even a day-to-week basis of what -- what your position entails?

MS. LINTHORST: Objection. Mischaracterizes the witness's testimony.

MS. VOLPE: I mean, you can -- you can answer.

MS. LINTHORST: You can answer it, yes, but...

A. Again, in my capacity for America PAC as treasurer, my responsibility is -- is to make sure that every dollar is accounted for and every dollar is properly reported. And so sometimes it is -- is having conversations with perspective donors and individuals who want to support the organization. That -- that can be conversations that occur frequently. There are

Page 13

conversations with the vendors that we're contracting with to make sure that the rates that they're applying or the -- the commissions that they make or that the retainers are accurate and appropriate, it's approving financials. I mean, those -- those are normal days. 527s don't have normal days. They -- they evenflow with the political calendars, as you can imagine.

Q. (BY MS. VOLPE) Okay. And is there a -- I guess a sense of -- what would be the most busy time as -- in your role as treasurer for America PAC?

A. It's usually the final month heading into an election, and then it's -- it's the -- maybe seven days leading up to a filing deadline. When you're categorizing, again, every dollar spent, every dollar raised, you're making sure that you have information required to -- to list, you know, who the donors were and properly, you know, accounting for addresses or information like that that the FEC requires.

Q. And do you -- is it just you running America PAC, or do you have vendors or independent contractors, or do you delegate any of your roles or responsibilities?

MS. LINTHORST: Objection; vague. Objection; calls for a legal conclusion.

MS. VOLPE: You can still answer the


MAGNA
LEGAL SERVICES

Page 14

question, yeah.

THE WITNESS: Okay.

MS. LINTHORST: If I tell you don't answer it, answer -- otherwise, you can -- you can answer.

THE WITNESS: Gotcha. I'm pausing until I'm told what to do.

MS. LINTHORST: Absolute --

A. So -- so, you know, I'm the sole director and sole treasurer of America PAC. Those are the only two formal roles that exist there with authority.

Aside from that, we have vendors, and we have consultants that we contract with and 1099 these organizations to -- to serve in different roles such as compliance or legal or, you know, firms who do voter contact -- paid voter contact work. So most of the responsibilities are -- are distributed in such a fashion.

Q. (BY MS. VOLPE) And are you responsible for approving any of the work that the vendors do on behalf of America PAC?

A. Again, as -- yeah. As -- as the director and treasurer, anything that comes in and out that door, I approve.

Q. Okay. And are you in charge of, I mean,

Page 15

overseeing any kind of marketing, or do you oversee the X account for America PAC?

A. I do not, personally, no. The -- the account is managed by a vendor for us.

Q. Okay. Let me just -- I'm sorry. Just give me one second there.

When it comes to the management of the X account, can you tell me the name of the vendor that manages the X account?

A. The X account is managed by ALX is the name of the firm. Yeah, and so -- no, they manage all the social accounts.

Q. And when you say manage the social accounts, can you describe what they do?

MS. LINTHORST: Objection; calls for speculation.

You may answer.

A. Yeah. Again, they -- they draft creative and copy, they submit for approval, and then they handle posts and interaction. You know, all the things that you would do for a social media account.

Q. (BY MS. VOLPE) Okay. And there is a formal contract between America PAC and ALX to --

A. Yes.

Q. -- manage America PAC's -- okay.

Page 16

A. Yes, uh-huh.

Q. And did you have to approve that contract before they started their work?

A. Yes.

Q. Okay. And can you tell me when ALX began managing America PAC's Twit- -- X account?

A. Early October of 2024.

Q. Okay. Do they also create the content for the videos that are posted on the X account?

MS. LINTHORST: Objection; vague.

You may answer.

A. No. So the -- the videos are also created by different vendors. There are several vendors who then film the videos, edit the videos, and then send those to the -- to the team at ALX.

Q. (BY MS. VOLPE) And how do you select those vendors that -- that manage that content -- that create the content?

MS. LINTHORST: Objection.

Could you point me to which topic that is referring to?

MS. VOLPE: When you say "topic," I mean, Nadin -- I'm assuming Nadin is speaking -- what -- can you be a little --

MS. LINTHORST: The 30 basics topics.

Page 17

The 14 topics that were provided.

MS. VOLPE: I believe that -- could we go off the record for a minute?

THE VIDEOGRAPHER: Okay. Let me go off the record then.

At 10:21, off the record.

(Recess from 10:21 a.m. to 10:27 a.m.)

THE VIDEOGRAPHER: We're back on the record at 10:27 a.m.

MS. VOLPE: All right. To make it clear, the deposition notice -- I can share my screen, and we can mark it as Exhibit 1. If I can share my screen. Let's see.

Now it's being -- are you able to see my screen?

(Exhibit Number 1 marked.)

MS. LINTHORST: Yes.

MS. VOLPE: Okay. This is the notice that we provided. It does not say that it's a 30(b)(6) deposition. So the deposition -- the way that we approached this deposition was Mr. Young would be a fact witness.

MS. LINTHORST: Thank you for providing that. Based on our previous discussions, including our meeting confer, it was -- it was

Page 38

that we had planned from the beginning of the program in the campaign.

Q. Okay. And so it's fair to say that they -- it coincides with the $47 petition signers?

MS. LINTHORST: Objection; mischaracterizes the witness's testimony.

You may answer.

A. So the -- by signing a petition and referring others, that makes an individual eligible for selection.

Q. (BY MS. VOLPE) Okay. So the eligibility for the giveaway was limited to registered voters?

A. Well, there was no giveaway.

Q. Okay. Let me --

A. Individuals had to earn this, so --

Q. Okay. Let me rephrase the question.

Did they have to be a registered voter?

A. To be selected -- well, to receive $47, they had to sign the petition and refer others. To be selected as a spokesperson, there was a similar, but more involved criteria that they would have to have met to be selected.

Q. Okay. So backing up to the -- the right to bear arms petition, all they had to do was sign up? They did not have to be a registered voter?

Page 39

MS. LINTHORST: Objection; vague.

You may answer.

A. So dependent upon the state, it was -- it was slightly different. But specific to, say Arizona, right? In Arizona, a simply signed petition didn't make that individual eligible for $47 or to be selected as a paid spokesperson. They would have had to have referrals. Referrals are -- are essential for -- for compensation. They have to earn those $47.

Q. (BY MS. VOLPE) Okay. So backing up to the petition, the $47 petition was only targeted towards swing states?

MS. LINTHORST: Objection; compound. Vague.

You may answer.

A. We selected seven states that we felt the program would be most impactful in.

Q. (BY MS. VOLPE) Okay. So, hypothetically, someone from Colorado was -- if they signed the petition, how would you know if -- I mean, would you -- how do you -- how do you verify that they're actually in that state, and it's not, you know, some -- some guy in Colorado signing up for the petition to --

MS. LINTHORST: Object -- objection; compound. Vague and speculation.

Page 40

You may answer to the extent you can.

A. Yeah. I mean that's -- I know your example is a hypothetical, but you -- you did have individuals who signed and completed the petition page that were not in the seven eligible states, right? And because those individuals put in first name, last name, email, cell phone, and a mailing address, we were able to match them back to -- to the state's voter files and confirm that those individuals would not be eligible -- eligible.

Q. (BY MS. VOLPE) And who specifically confirmed that these individuals were eligible? I mean, because it sounds like it was a vendor, because obviously you're not -- you're not going to do that on a day-to-day basis with hundreds and thousands of folks signing up.

A. Right. So vendors -- vendors IMGE -- I-M-G-E -- managed the petition page, but also the submissions coming in and built the -- the filters to be able to basically bucket out, you know, eligible criteria. And then they could -- they could adjust the filters to figure out, you know, if we were missing anyone or if they were missing fields. And they would then work with other vendors on the team who did data work to make sure that we were matching it back to the

Page 41

voter file as best we could.

Q. So basically it sounds like IMGE was the one confirming that this was a -- an actual voter who was referring and registered in their state; is that fair to say?

MS. LINTHORST: Objection; mischaracterizes the witness's testimony. Compound. Vague.

But you can answer.

A. Did -- yeah IMGE, along with other vendors, would work to match those individuals back to state voter files, whether in the state that they listed or in other states, yes.

Q. (BY MS. VOLPE) And what other vendors were involved in the -- in the confirmation of making sure that these are actual voters?

A. Red Oak Strategic was -- was also a data firm that was involved in that. They would provide the base voter file for IMGE to match against.

Q. And would you -- do you know anything about how quickly this process took, I mean, to verify all this data?

MS. LINTHORST: Object --

Q. (BY MS. VOLPE) I mean, do you have any insight into that?



Page 42

MS. LINTHORST: Objection; vague. Calls for speculation.

You may answer.

A. That would be a question for the vendors.

Q. (BY MS. VOLPE) Okay. And as far as the -- I want to talk about the spokesperson-consulting agreements. How were those individuals selected to -- to, you know, earn -- I'm going to use your phrase, and I know we're here because of a lawsuit, so I'm going to use the phrase that you're using -- it's how did you select those individuals?

A. Yeah. So we, in concert with legal counsel, developed a criteria to ensure that we were compliant with state and federal law. And then in, you know -- and then we would pull a list from each state of the individuals that matched that criteria, and I would review those -- those individuals to try to make the best selection I could.

Q. And what criteria did you use to select the individuals?

A. First and foremost, obviously they had to have signed the petition and had referrals. They had to be a registered voter. So what that meant, they were eligible for the program. They had to have already cast a ballot whether in person or by mail

Page 43

prior to us announcing the million dollar program. And then from there on, it just went through a vetting process. You know, I would -- I would individually vet the folks who matched that criteria to -- to try to make the best selection of someone who ideologically aligned with America PAC, the values, and the values of the petition.

Q. And when you say they had to -- they had to have referred folks, was there a number that you were looking for on individuals who referred to friends and families in that state? I mean, how -- you know, how did you -- what was the number that you were looking for, as far as referrals?

MS. LINTHORST: Objection; compound. Vague.

You may answer.

A. Yeah. A higher volume of referrals certainly puts you higher on my list, because it meant that you were someone who was bought into the program. But the -- the -- the -- the reason that referrals became a -- a high value criteria, is it would help you weed out spam or fraudulent submissions or individuals who were trying to, you know, spoof or fraudulent submissions. So referrals were -- were rarely something that you saw come in through fraudulent

Page 44

submissions.

Q. (BY MS. VOLPE) And when you're talking about selecting -- you know, that -- kind of that first level I would say to get over the hump of qualifying for you to select them, what -- did they have to provide any kind of resume to you prior to you selecting the spokesperson?

MS. LINTHORST: Objection; vague.

You may answer.

A. So, again, I -- I already laid out the criteria that we would use, and then we would vet those individuals. We would pull -- once I narrowed a list down of folks who were eligible, and I had, you know, interest in these being potential selections, we would put them through a criminal background check, we would -- we would search and do vetting using tools like LexisNexis or others to -- to determine what their public persona and footprint looked like. And from there, you could make a pretty strong, you know, case for -- for how that person would have performed as a spokesperson.

Q. (BY MS. VOLPE) And did you ever look at their social media prior to talking to them? Just like public --

A. Yes.

Page 45

Q. Okay.

A. Yeah.

Q. So and you -- I'm just rephrasing what you're saying. So you would run them through a background check, you would search LexisNexis. It's fair to say that you would use social media accounts to know who -- to get an idea of who they are?

MS. LINTHORST: Objection; mischaracterizes the witness's testimony.

You may answer.

A. Again, we would -- we would pull a comprehensive background check, a vetting document. And if they had a social footprint, we would also pull in their social footprint and use that.

Q. (BY MS. VOLPE) And when you say "vetting document," what do you mean by vetting document?

MS. LINTHORST: Objection; asked and answered.

You can answer again.

A. Again, a vetting document is a pretty standard document in the political space that tells you everything from criminal background history to age, marital status, children. You know, you're looking at -- at the street address, right, and characteristics like that. So it just gives you a really good handle



12 (Pages 42 to 45)

Page 46

on this person's public persona.

Q. (BY MS. VOLPE) Okay. And, you know, it's fair to say that when these -- the spokesperson consulting agreements, the winners did not know prior to signing that they would receive one million dollars before signing?

MS. LINTHORST: Objection; calls for a legal conclusion. Objection; compound. Vague. Objection; mischaracterizes the witness's testimony.

You may answer.

A. Well, there -- again, there were no winners. There were individuals who earned. And so when -- when a selection was announced, that was after we had interacted with the individual. They -- they had, you know -- they were aware of -- of what they had been selected to do, and what those responsibilities were going to be.

Q. (BY MS. VOLPE) Okay. So prior to announcement, they were -- I mean, I'm just characterizing. As far as the social media and the videos -- you're familiar with the videos of your spokespersons having an interview with your team, correct?

MS. LINTHORST: Objection; compound. Vague. Mischaracterizes the witness's testimony.

Page 47

You may answer.

A. I recall the videos that they -- they shot, and we -- we released, yes.

Q. (BY MS. VOLPE) And the description in those videos kind of described I would say, I -- in my opinion, like a -- I'm trying to think of the -- the Clearinghouse Sweepstakes. You know, the van comes in, the check, the large check. When they were actually -- when that was happening, when you guys filmed the -- the individual receiving the check, they actually already knew that they were selected; is that fair?

MS. LINTHORST: Objection; calls for a legal conclusion. Mischaracterizes the witness's testimonies. Calls for speculation. Compound and vague.

You may answer.

A. So slight nuance, you know, with some, we would attempt to capture their authentic reaction to the very first, you know -- you know, awareness of this interaction. But yes, like, our -- our team on the ground was going out to advance this, would have to make contact before they arrived. They knew what our folks were arriving to do and what was involved in that process.

Q. (BY MS. VOLPE) Okay. And as far as the --

Page 48

the individuals from America PAC, did you ever personally -- were you ever involved in participating in bringing the check to any of the spokespersons?

A. Yes.

Q. Okay. And whose idea was it to surprise the spokespersons in that -- was that like a team social media?

A. I -- I don't recall. To the best of my recollection, I think it was -- it was a creative team idea, you know, that comes about in the moment.

Q. Okay. And prior to you running a criminal background check and, as you've said, a vetting sheet, did they actually have to apply to become a consultant?

MS. LINTHORST: Objection; vague. Objection; calls for a legal conclusion.

You may answer.

A. Well, the application process was a signed petition in referring others. That -- that's what created eligibility for selection, right? So if -- if they signed -- if they signed a petition, they referred others, they had taken the -- the steps to basically apply for eligibility.

Q. (BY MS. VOLPE) Okay. So there was no -- just -- it's fair to say there was no formal application to become a consultant for America PAC?

Page 49

Well, they didn't have to fill out anything else?

MS. LINTHORST: Objection; vague.

You may answer.

A. Again, the -- the individuals filled out the petition page. We had vetted and gone through that process through that full thing and then, you know, announced the selection.

Q. (BY MS. VOLPE) Okay. And in your -- in your vetting selection, did you specifically look for consulting experience?

MS. LINTHORST: Objection; vague.

You may answer.

A. I don't recall. I don't recall that being a piece of vetting. We certainly looked at their employment, and we looked at their current or former employment. And again, from that, you can -- you can deduce who was going to be a good fit for this type of role.

Q. (BY MS. VOLPE) Okay. And what -- and so what consulting did they provide for America PAC? Each spokesperson is a spokesperson consulting agreement, so what type of consulting did they do for America PAC?

MS. LINTHORST: Objection; vague.

You may answer.

A. The -- the agreement laid out in -- in detail

MAGNA
LEGAL SERVICES

Page 54

referred more than 12 petition signers?

A.  America PAC can provide that.  I'm sure we have those numbers.  And we can -- we can work with our -- our counsel to get that for you.  But I don't off the top of my head, no.

Q.  Okay.  Would you say -- would it be a fair estimate to say more than five or more than ten?

MS. LINTHORST:  Objection; calls for speculation.

You may answer.

A.  You're -- you're asking did more than five or ten people in most states exceed the W9 threshold? Yes.

Q.  (BY MS. VOLPE)  Would it be fair to say over a hundred?

A.  Yes.

Q.  Okay.  And so when you're -- when you're talking about -- so the preselection criteria would be to refer individuals more than 12.  I want to talk a little bit about the spokespersons that were actually given the one million dollars.  Do you recall each of those individuals referring -- or how many petition signers they referred?

MS. LINTHORST:  Objection; compound. Vague.

Page 55

You may answer.

A.  I -- I don't recall the exact number that -- that each had.  I do know it was multiple referrals, but I don't recall the exact number off the top -- -- not -- not right now.

Q.  (BY MS. VOLPE)  Okay.  And would you also have to verify each referral to make sure and to ensure that they are a registered voter?  So if I -- for -- I've give you a hypothetical.  Hypothetically, if I refer 12 of my friends, six of them are non-registered voters, six are registered voters, in order to meet the criteria, would the referrals actually have to be registered voters to meet that twelve -- to meet the 1099 threshold to ver- --

MS. LINTHORST:  Objection; compound. Calls for --

You may answer.

A.  Yeah.  So, again, America PAC -- the only way we're counting a referral was if we could authenticate to the best of our ability that that individual who met the criteria was a registered voter, had signed, you know, on their own behalf, and filled in the required fields to match them.

Q.  (BY MS. VOLPE)  Yeah.  And how does limiting the eligibility to registered voters advance the

Page 56

purpose of the petition?

MS. LINTHORST:  Objection; vague.

You may answer to the extent you understand the question.

A.  The -- the reason we use registered voters was as a safeguard against a 527 engaged in American -- you know, federal elections, potentially sending, you know, dollars or payments to foreign nationals which would have violated, you know, countless laws.  So registered voters was a safeguard against that.

Q.  (BY MS. VOLPE)  And as far as the -- does the vendor that specifically vetted the petition signers, can you please state the name of the vendor who would verify to -- that they were actually registered voters?

MS. LINTHORST:  Objection; asked and answered.

But you can answer again.

A.  Yeah.  So I-M-G-E, IMGE, predominately handled most of the matching.  If they ever needed additional help or bandwidth, then they would also work with the team at Red Oak Strategic.

Q.  (BY MS. VOLPE)  Okay.  And I just want to go back to the -- the winner selection.  As far as the -- do you remember or recall why, specifically -- I'm just going to -- I mean, for example, Daisy Mozer, does that

Page 57

sound familiar?

MS. LINTHORST:  Objection; calls for a legal conclusion.  Mischaracterizes the witness's testimony.  Compound and vague.

You may answer to the extent you understand the question.

A.  I -- I recall the name, yes.

Q.  (BY MS. VOLPE)  And you -- again, you -- I'm just repeating back what you said.  You were involved in hand selecting the spokesperson consulting -- the consultants.  I'll just call them spokesperson consultants.  You were responsible for selecting the spokesperson consultants, correct?

A.  Yes.  I selected all 18.

Q.  Do you remember why you specifically selected Ms. Mozer?

A.  I would have to look back at the -- at the vetting doc, and -- and the -- you know, the criteria. But, again, it probably was because -- or I'm sure it was because she matched the criteria I'd already laid out.

Q.  And how about Mr. Joshua Mayo?

A.  Again, they -- they all were selected based on the same criteria or similar criteria.

Q.  Was there ever a point in your selection --

MAGNA
LEGAL SERVICES

Page 82

made contact and let us know that their address has changed or whatever that may be. So we had help desks stood up that vendors managed for that purpose.

Q. (BY MS. VOLPE) Okay. And the online help desk is through IMGE, or is it a separate vendor that the -- it -- subcontracted. (Unintelligible due to Internet connection.)

MS. LINTHORST: Objection; mischaracterizes the witness's prior testimony.

You may answer.

THE REPORTER: I'm sorry.

A. I mean --

THE REPORTER: Can you actually repeat the question? I'm so sorry. It cut out for me. I don't know why, but it froze for me. If you could please repeat the question. I'm sorry.

Q. (BY MS. VOLPE) The question was -- I could rephrase it. Who manages the help desk for voters or for the petitioners to contact whenever they have an issue with the payment?

A. Yeah. IMGE manages the help desk.

Q. Does IMGE contract through -- do they subcontract for any of this work that has been delegated to them?

MS. LINTHORST: Objection; calls for

Page 83

speculation.

You may answer to the extent you know.

A. I don't know.

Q. (BY MS. VOLPE) Okay. Can you -- I want to go back to the spokespersons consulting agreement. What was the timeline? What was the -- I guess what was the timeline in selecting the individuals who were -- I think you mentioned 18. How fast of a timeline were you looking at when you were selecting those individuals?

MS. LINTHORST: Objection; vague.

You may answer.

A. Varied. It varied dependant upon the individual, the state, where we were in the calendar. So it -- it varied anywhere from, you know, 24 hour lead time to some of these multiple days out where we would make that selection.

Q. (BY MS. VOLPE) Okay. Did you ever -- I want to go back to the spokesperson agreement. Did you ever consult with anyone else when you were making the vetting process, or was it just you? I mean, did you ever have -- you said -- you mentioned a team. So did you ever bounce ideas off of indiv- -- you know, with your team on selecting the spokespersons?

MS. LINTHORST: Objection; compound.

Page 84

Q. (BY MS. VOLPE) -- or was it -- are you the sole decision-maker?

MS. LINTHORST: And objection; asked and answered.

But you may answer again.

Q. (BY MS. VOLPE) I can break that up --

A. Yeah. I -- I can maybe consolidate it into one -- one answer for you.

The -- no. I was the sole decision-maker on these. So while I would -- I would share, you know, my conclusion with the team and my selection with the team so they could go execute, you know, making contact, booking flights, sending production crew, whatever that may be, you know, I -- I made the determination on those.

Q. Okay. Thank you.

A. Uh-huh.

Q. Do you have any internal selection criteria or -- for select vendors when working with America PAC?

MS. LINTHORST: Objection. I believe that might have been asked and answered, but also it cut out for me.

THE WITNESS: Yeah, same. I think you might need to get back on your hotspot.

MS. VOLPE: I'm on my hotspot. I

Page 85

think -- yeah, I'm on the hotspot. Do you want to take a five-minute? I'm going to try to reconnect because I -- you're freezing, and I think the -- the court reporter is freezing on my end. So do you mind if we take a five-minute break, and I'll try to reboot?

MS. LINTHORST: Sure.

MS. VOLPE: Yeah. We've been having some issues, and --

THE VIDEOGRAPHER: We're off the record at 12:02 p.m.

(Recess from 12:02 p.m. to 12:16 p.m.)

THE VIDEOGRAPHER: We're back on the record at 12:16 p.m.

Q. (BY MS. VOLPE) All right. Mr. Young, can you describe if America PAC has had -- has any KPIs on the success of the petition and the spokesperson agreement?

A. I'm not aware of any KPIs. Again, the only -- the only thing we measured, to my knowledge, was looking back and saying, compared to previous electoral performance, did the individuals who signed the petition participate at a higher or lower rate? That would be the only thing. And it's not broken down to the individual. It's just totality state by state.

Q. Okay. And that's based on your own personal

MAGNA
LEGAL SERVICES

Page 106

MS. LINTHORST: It's okay.

Objection; compound. Vague.

But you answered, which I was going to say you can answer anyway.

Q. (BY MS. VOLPE) Is there any other information that America PAC collects to analyze swing voters based on collected information?

MS. LINTHORST: Objection --

Q. (BY MS. VOLPE) Or voters that made --

MS. LINTHORST: Objection; compound. Vague.

You may answer.

A. Via the petition?

Q. (BY MS. VOLPE) Yes.

A. No.

Q. Was there any scenario where you would have a -- let's say a petition -- a petition signer who was originally registered as a Democrat, but may have registered as a Republican? Is there any kind of distinguishing -- do you -- do you use that as any kind of data to make a determination on whether they would be a candidate for a spokesperson?

MS. LINTHORST: Objection; calls for speculation.

You may answer.

Page 107

A. I mean, I can't -- I can't -- the only hypothetical -- I can tell you a real scenario. I mean, if you look through the petition signers, there are registered Republicans, there are registered Democrats, and there are registered Independents who were selected to serve as spokespeople.

Q. (BY MS. VOLPE) Okay. Thank you.

A. Uh-huh.

Q. But there's no information that you used to collect for -- for folks who may be -- I would say specifically Independent or maybe there's -- how do you vet that information as far as how you know what their belief system is?

MS. LINTHORST: Objection; compound. Vague.

And to the extent that it infringes on any first amendment rights, you may respond at a high level.

A. Yeah. Again, I mean, they're signed -- they've already signed a petition supporting the first and second amendments, so they've given us a good sense of -- of where they stand ideologically, and that's aligned with the super PAC. So if they stand for those two things, they're a great candidate for a spokesperson.

Page 108

Q. (BY MS. VOLPE) Okay. Was there anything that the petition signers signed that informed them that their information might be retained indefinitely?

MS. LINTHORST: Objection. Vague.

You may answer.

A. I -- I don't know. I would look back at -- at the language used on the petition page, and just refer you back to that.

Q. (BY MS. VOLPE) Okay. Is there any option -- was there any -- a time where a petition signer contacted America PAC and said I want to opt out of the information that I provided?

A. I -- I think you already asked that question. And I -- that has never come to me. So if someone did, that communication hasn't made its way to me.

Q. Okay.

MS. VOLPE: I think that is all the questions I have for today. So that concludes the deposition for --

MS. LINTHORST: I do have questions on redirect. Could we just take a five-minute break?

MS. VOLPE: Oh, I'm so sorry, Nadin.

MS. LINTHORST: That's okay. Could we just take a five-minute break before we do the redirect?

Page 109

MS. VOLPE: Yeah. I'm sorry to keep asking for ten, but do you mind if it's -- I just have --

MS. LINTHORST: We can do ten. Ten is fine.

MS. VOLPE: Okay, okay. Yeah. I like ten. Thank you so much. Thank you.

THE VIDEOGRAPHER: We're off the record at 12:48 p.m.

(Recess from 12:48 p.m. to 1:03 p.m.)

THE VIDEOGRAPHER: We're back on the record at 1:03 p.m.

MS. LINTHORST: Okay. Mr. Young, I have a few questions for you on redirect.

CROSS
EXAMINATION
BY MS. LINTHORST:

Q. Can you explain your role here today?

A. I'm here as a -- as a -- I guess an expert or firsthand account on behalf of America PAC.

Q. Okay. How many years have you worked as a political operative?

A. Since 2007.

Q. Okay. What would you say your experience is in running section 527s and/or 501(c)(4)s?

MAGNA
LEGAL SERVICES

Page 110

A. At this point, I've probably run more C4s and 527s and working more 527s than anybody else on the Republican side of the aisle.

Q. Okay. Are you an attorney?

A. I am not.

Q. Okay. So America PAC isn't your first PAC; that's correct?

A. Correct.

Q. Based on your experience, how familiar are you with how voter information is obtained and used in campaigns?

A. Incredibly familiar.

Q. Have you had the occasion to purchase licenses or otherwise access voter data?

A. Yes.

Q. And in your experience, what is the cost of an individual voter record?

A. Pennies. It -- it varies dependant upon the -- the state or the use case. Sometimes it's even free. Certain states actually provide the voter file for -- for free.

Q. Okay. Do you know what states -- states those are on the top of your head?

A. I don't. I know that some states -- golly. Maybe Pennsylvania might be one of them. Most states,

Page 111

it's like 15 or 20 dollars, and they'll -- they'll provide the file to you. It's pretty cheap.

Q. Okay. And what type of voter information is commonly available to the political organizations?

A. All the same relevant fields that we ask for on the petition. So first, last, date of -- well, more than what we ask for on the petition, but those are included within it. So first, last, date of birth, mailing address, party registration. Certain states have ethnicity and gender on the file. Most states will also have telephone numbers. Some will provide email. It just -- it depends on which state you're dealing with and what they'll provide.

Q. Okay. I am going to share a petition page with you to confirm the information. I'm going to actually try to drop it in the chat, so let's see if that works better. Let me know if you see that in the chat.

A. One second. I downloaded. Let me open that. Okay.

Q. Okay. Do you see with me petition in favor of free speech and the right to bear arms?

A. Yes.

MS. LINTHORST: Okay. Can we mark that as the next exhibit? I -- I don't recall what

Page 112

number we're on.

MS. VOLPE: I believe it's 5.

THE REPORTER: It's 5.

MS. LINTHORST: 5, okay. Can we please mark that as Exhibit 5? Thank you.

(Exhibit Number 5 marked.)

Q. (BY MS. LINTHORST) All right. So this -- let's go through each -- what -- was a person -- according to the page you see here, was a person required to provide their first name?

A. Yes.

Q. Their last name?

A. Yes.

Q. Email address?

A. Yes.

Q. Cell phone number?

A. Yes.

Q. Does it say: Will only be used to confirm you are the legitimate petition signer. No other purpose?

A. That's -- that's correct.

Q. Mailing address?

A. Yes.

Q. And then it asks: Did someone refer you?

A. Uh-huh. That's correct.

Page 113

Q. And then email or cell phone number?

A. Correct. That's how we would match the referral.

Q. That was going to be my follow-up question. What was that email or cell phone number used for?

A. Uh-huh. Match the --

Q. And then signed petition?

A. -- referal.
   Yes.

Q. Okay. So this -- what you see here, there was no other information requested by an individual who wanted to sign the petition?

A. That's correct.

Q. Okay. And is it your testimony today that this is the same information that was already provided or that you already had through voter record information?

A. Yes. We can -- we can access from the state or from entities such as the Data Trust, L2, I360. All these are entities that we can license data that would have all these fields.

Q. Okay. So there was nothing new that an individual was providing that you already -- have the ability to have access to; is that correct?

A. Correct.

MAGNA
LEGAL SERVICES

Page 118

those others who were referred would have still had to have listed your -- either your email or your cell number for you to get credit for those referrals.

Q. Was there anything else that an individual would be qualified for once they signed the petition?

A. If you sign the petition and refer to others, you would be eligible to be selected as a spokesperson. Beyond that, there -- there -- there wasn't anything else. I mean, their -- the petition signature was a requirement to attend some of our townhall events, things like that. We weren't going to let people into a townhall even who hadn't signed the petition first to attend. But that -- that would have been about it.

Q. Okay. And did you -- did an individual need to be registered to vote to sign the petition?

A. To sign it? No. To receive payment? Yes.

Q. Was any compensation guaranteed simply for providing information when you signed the petition?

A. No. Again, if -- if you fill out all the appropriate information -- outside of Pennsylvania, if you filled it all out and you matched the criteria -- be a registered voter, etcetera, and eligible -- you still had to refer individuals. Pennsylvania was the only state where that wasn't the case.

Q. Okay. Let's discuss the rally that Elon Musk

Page 119

attended on October 19th, 2024. Did you know that Elon Musk was going to attend that rally?

A. Yes.

Q. Did you know what he was going to say at the rally?

A. No.

Q. Did America PAC provide him a script?

A. We did not, no.

Q. What was your reaction when he said one million dollars would be provided randomly?

A. I was surprised. It was not the words I would have chosen, and it was not the way that we had -- you know, with legal counsel and consultation, discussed the program and how it would run.

Q. Okay. How was he involved with the one million dollar opportunity?

A. He's a -- a donor to the super PAC. So he was -- he would be involved in the same way that any other donor was involved. He -- you know, I would give him updates, just like anybody else about what the PAC is up to, what we're doing, next events. Again, just so that he's not surprised. Just like any other 527 or C4 or any entity that I've ever run, you try to keep your donors in the loop.

Q. Did he require those updates?

Page 120

A. No. No. It was not a requirement.

Q. Did he ever -- did he ask for you to provide those updates?

A. Every donor asks for updates. So yeah, I mean donors -- donors always want to know how their -- how the money at any entity is going to be utilized, so yeah. But the same way that every other donor did.

Q. Was he involved in day-to-day decisions for America PAC?

A. No. I mean, he's got a full time -- he's got multiple full-time jobs, running multiple, you know, large companies. So I think he had a vision and probably an understanding of what America PAC needed to do and execute. And then he trusted the folks at America PAC and myself to execute and deliver on that.

Q. Okay. How often did you communicate with Elon Musk?

A. It depends on the time frame. You know, in the early days at America PAC, every few days, maybe once a week. As the cycle got later and later, it was, you know, daily. And then as you came down to the final weeks, there would be a lot of updates, because there's a lot of information to update. There's lots of polls across the country. There's public stories, there's news that's breaking all the time. So

Page 121

you're -- you're constantly trying to keep your donors, you know, well informed about what's going on.

Q. And, again, he did not require you to do any of that; is that correct?

A. No. Correct.

Q. Okay?

A. Yeah.

Q. Ms. Volpe asked you about a big check that was presented at a rally. Do you recall that?

A. The -- like the prop checks?

Q. Do you recall the question -- the question being asked to you --

A. Oh, yes.

Q. -- regarding this?

A. Yes, yes.

Q. So let's go back to that. Was -- that was a check where Elon Musk's signature was on it, correct?

A. His signature was on, like, maybe the first one or two checks, but not every check that went out.

Q. Okay. Was that a real check that was presented at the rally, that big check?

A. No. That was a -- that was a check that we got printed at Staples.

Q. Okay. So what would you consider that?

A. That's a -- that's a prop. That's a -- you

MAGNA
LEGAL SERVICES

Appx. 3
Excerpts of the Deposition of Jacqueline McAferty
January 20, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JACQUELINE McAFERTY,          §
individually and on           §
behalf of all others          §
similarly situated,           §
                              §
      Plaintiff,              §
                              §
                              §   CIVIL ACTION NUMBER
v.                            §       1:24-cv-1346
                              §
                              §
ELON REEVE MUSK &             §
AMERICA PAC,                  §
                              §
      Defendants.             §

- - -

ORAL DEPOSITION
(VIA ZOOM VIDEOCONFERENCING)
OF
JACQUELINE McAFERTY

TUESDAY, JANUARY 20, 2026

- - -

INTEGRITY LEGAL SUPPORT SOLUTIONS

www.integritylegal.support

26

the First and Second Amendment?

A.  Well, that was true that I support the First and Second Amendment, but that wasn't the sole reason I signed it.

Q.  What was the sole reason you signed it?

A.  There wasn't just one reason, but part of the reason was that.  The other part was I do believe in voter involvement, and then, yes, it would be great to win a million dollars.

Q.  Okay.  Would you say that you signed the petition more because you wanted to win a million dollars than the First and Second Amendment?

A.  It's hard to quantify.

Q.  Okay.  So walk me through, I guess, from beginning to end, so your brother sent you the text message, and then you signed it shortly thereafter?

A.  Yes.

Q.  Okay.  Had you seen any rally videos related to the petition?

A.  Prior to the petition, I don't believe so.  Prior to me signing the petition, I don't believe so.

27

Q.  Did you see any afterwards?

A.  I could have.  You know, not the whole rally, but maybe clips on the news from them.

Q.  Do you recall any of it?

A.  I don't recall any specifics.

Q.  Do you recall who was in the rally video?

A.  I -- sorry; I don't recall.

Q.  Okay.  Would it be fair to say that the petition functioned like any other political advocacy petition you had seen before?

A.  I don't know.  I told you, I hadn't been involved in political petitions prior to this much.

Q.  So this is the only one that you're basically familiar with.

When you say you weren't "involved with petitions that much," were you involved with any at all that you can recall?

A.  Just, you know, people coming to your door in the neighborhood and saying, "We want such-and-such candidate.  Do you mind signing?  That doesn't mean that you will support them.  It will just put them on the

28

ballot."

I probably signed a few of those types of petitions, if you call that a petition.

Q.  You can call that a petition.

Did Elon Musk play any role in your decision?

A.  Yes, definitely.  Well, just because I knew it could be real.  He really -- you know, for him a million dollars is no big deal.  It's a great way for him to get some involvement.  I thought, "Good idea, Elon."

(Exhibit 1 marked for identification.)

BY MS. LINTHORST:

Q.  Okay.  I'm going to drop my first exhibit in the Chat.

Do you see where you can access the Chat?

A.  Yes.

Q.  Okay.  Did that come through to your end?  It should say "Exhibit 1 - McAferty versus Musk."

Okay.  Let me know when you have that open.

A.  Okay.

Q.  Okay.  So it should say "Plaintiff

29

Jacqueline McAferty's Responses to Defendant's First Set of Requests For Admissions."

Did I read that correctly?

A.  Yes.

Q.  Okay.  We're going to scroll to -- it should be Page 3 where it starts "Plaintiff's Objections and Responses to Defendant's First Set of Requests For Admission," and you'll see Requests For Admission No. 1.

Are you there with me?

A.  Yes.

Q.  Okay.  We're going to go to Request For Admission No. 3 where you denied having any other documents "in Your possession, custody, or control that would reflect what You reviewed before signing the petition."

It says here "Plaintiff reviewed and was exposed to additional public representations by Defendants, including online statements and promotional materials, whether or not those materials are presently in Plaintiff's possession in documentary form."

Did I read that correctly?

A.  Yes.

Q.  Okay.  So we spoke a little bit

34

this is the screenshot that reflects the petition page as it appeared on the date you signed, October 20th, 2024, and that's based on records from America PAC's third-party vendor, do you have any reason to dispute that representation?

A. No.

Q. All right. So you'll see where it says "First Name"?

A. Correct.

Q. Did you input your first name there?

A. Yes.

Q. What did you put?

A. Jacqueline.

Q. And for "Last Name," what did you put?

A. McAferty.

Q. And for "Email Address," what did you put?

A. Jackie.McAferty@gmail.com.

Q. And for "Cell Phone Number," what did you put?

A. 480.518.1024.

Q. Okay. And for "Mailing Address," what did you put?

35

A. 3158 East Harmony Avenue, Mesa, Arizona 85204.

Q. Okay. And then you see the question that says "Did someone refer you?" And did you put anything there?

A. I probably would have put my brother, because he's the one that referred me; Wes Wagner.

Q. Do you recall if you put his email or cell phone number?

A. Well, if it asked for it, I would have put it. But I think it was probably his cell phone number.

Q. What's his cell phone number that you would have put in?

A. Hold on. (Witness reviews documents.) It would have been 602.478.9248.

Q. Okay. If you were to put in an email address, what would you have put?

A. Gww -- hold on just a sec.

Q. Uh-huh.

A. Gwwpkc@aol.com.

Q. Okay. And then did you click "Sign The Petition" right there afterwards?

A. Yes, I did.

36

Q. Okay. Did you pay any money to sign this petition?

A. No. It wasn't required.

Q. Were you asked to pay any fees to sign this petition?

A. No.

Q. At the moment that you signed this petition, did you believe signing alone would be sufficient to earn $1 million?

A. Oh, of course not. It was a drawing. It would be a chance to win a million dollars; not get a million dollars.

Q. Okay. Did you read any other part of this web page before you signed?

A. I don't recall; sorry.

Was there some introduction that talked about the -- there seems like there was some introduction that talked about the First and Second Amendment.

Q. Okay. Do you recall scrolling below to sign the petition button?

A. I don't remember.

Q. Okay. I'm going to read what's underneath that there. It says "Each person may only sign this petition once. Eligible people

37

may only list one eligible person as their referrer.

"Signing the petition on behalf of another person is not permitted. Before payment is made, America PAC will verify the accuracy of all information of the referrer and referee.

"Payments of $600 or more will require the referrer to provide a signed IRS W-9 so an IRS 1099 can be issued. To be eligible, both the referrer and the petition signer must be registered voters of Arizona, Georgia, Michigan, Nevada, North Carolina, Pennsylvania, or Wisconsin."

Did I read that correctly?

A. I think I recall seeing that, too.

Q. Okay.

A. Out of curiosity, did you actually ever pay anybody the $47?

Q. I'm not go going to be answering that question.

Did you also expect to receive $47 in addition to the $1 million?

A. I didn't know -- I didn't know for certain that anybody that I sent that text to would have signed up.

**38**

Q. Okay. What was your understanding of how an individual would receive $47?

A. Just with that piece at the bottom of that website, that if they were also -- that if they -- if you were -- they had referred you, they would get $47 for you signing up.

Q. Okay.

A. You saw the text message. There was a joke about that.

Q. Did your brother receive $47?

A. Not that I know of.

Q. Does this website, do you see anything here that says "drawing"?

A. Sorry; I lost it. Let me go back and find it.

Q. No problem.

A. (Witness reviews documents.) Okay. What was your question?

Q. Do you see any word on this page that says "drawing"?

A. No.

Q. "Lottery"?

A. No.

Q. "Chance"?

A. No.

**39**

Q. Or "sweepstakes"?

A. No.

Q. Okay. Do you recall reading any privacy policy language?

A. Sorry; I don't remember.

Q. Okay.

A. But isn't that implied if you give out personal information?

Q. Is what implied?

A. That it's going to be kept safe and secure.

(Exhibit 3 marked for identification.)

BY MS. LINTHORST:

Q. So I'm going to drop in another exhibit.

MS. LINTHORST: Please mark that as Exhibit 2, if I haven't said that already.

BY MS. LINTHORST:

Q. Let me know when you see it.

A. I see it.

Q. Let me know when you have that opened.

A. Okay. I see it.

Q. Okay. Does it say "America PAC

**40**

Privacy Notice"?

A. It does.

Q. Okay. If I represent to you that this screenshot reflects the privacy policy as it appeared on the date you signed it based on the records from America PAC, third-party vendor, do you have any reason to dispute that representation?

A. I don't have any reason. I don't know if it did or not.

Q. Okay. I'm going to go ahead and read it now. "America PAC values your privacy and trust. Personal Identifying Information collected via the www.theamericapac.org will only be used to support America PAC's activities, and it will not be shared with any advertisers, political organizations, or third parties not directly affiliated with America PAC."

Did I read that correctly?

A. Yes.

Q. Okay.

A. It looks like that's correct.

Q. You don't have any personal knowledge of America PAC's internal data-

**41**

handling practices, do you?

A. I do not.

Q. Do you have any personal knowledge that your information was shared with anyone outside of America PAC?

A. I don't have any personal information about that.

Q. Okay. After reading that, would you have any reason to believe that your personal information was shared outside of America PAC?

MR. SHORT: Object to the form.

A. I don't know that.

BY MS. LINTHORST:

Q. Do you recall seeing any written criteria, rules, or guarantees in order to earn $1 million?

A. I do not.

Q. Based on what you read on the petition page, what did you understand about how someone would be selected to receive $1 million?

A. I don't think that addresses it. I think what gave the appearance of it being a drawing or a chance drawing was comments by Elon Musk.

42

Q.  And what were those comments?

A.  Just that they wanted somebody to win a million dollars a day until a certain date -- I think it was the 24th of October -- and that it was open to everybody to have that opportunity.

Q.  Okay.  Did you understand that folks that would be selected to earn $1 million would also be spokespersons?

A.  I don't know that I did.

(Exhibit 4 marked for identification.)

BY MS. LINTHORST:

Q.  Okay.  I'm going to now put another exhibit in here.

MS. LINTHORST:  Could you please mark that as Exhibit 3.

BY MS. LINTHORST:

Q.  And I will be dropping Exhibit 4 into the Chat now.

Let me know when you see it.

A.  I see it.

Q.  Okay.  Let me know when you have it open.

A.  Okay.

43

Q.  Okay.  On your end, do you see what appears to be a social media post by America PAC?

A.  Yes.

Q.  Okay.  I'm going to go ahead and read that.

"The second $1 million check given to an audience member in Pittsburgh.

"Every day from now until Election Day, one registered swing state voter who signs the petition supporting the Constitution will be selected to earn $1 million as a spokesperson for America PAC."

Did I read that correctly?

A.  Yes.

Q.  Had you seen any sort of messaging like this before?

A.  This is the type of thing that was available, yes.

Q.  Okay.  So reading this now, did you understand that folks that would be chosen to earn $1 million would also be spokespersons?

A.  I guess the misunderstanding is I didn't realize they were preselected before they earned the million dollars.

44

Q.  Okay.  So you did understand to some extent that they would also be spokespersons?

A.  Yes.  But my understanding was that it would be a random drawing, and that person would be asked to be a spokesperson, not that they had decided ahead of time who the spokesperson would be.

Q.  Okay.  Do you see the word "drawing" in the social media post?

A.  No.

Q.  "Chance"?

A.  Well, no.  But it's implied "...signs the petition supporting the Constitution will be selected...  One registered swing state voter..."  That's totally implying that somebody will be selected.

Q.  Okay.  What did you understand about how the spokespersons would be selected?

A.  Well, I didn't understand that they would be selected prior to awarding.  I understood that they would have the drawing, and then ask a person to be a spokesperson.

Q.  Okay.  Could you walk me through how you believed America PAC would choose an individual to earn $1 million.

45

A.  I thought it was a random drawing.

Q.  And --

A.  I feel like there was things from Elon Musk in the news that stated such.

Q.  What was your belief about how they would choose a random person, or how it would be conducted?

A.  I did not know the mechanics of it.

Q.  Okay.  Did you have an idea of how you thought that would happen?

A.  None.  I just expected him to be honest and make it random.

Q.  What did you understand about whether payment of $1 million was guaranteed?

A.  Sorry.  Could you ask that question in a different way?  What are you --

Q.  Sure.  Like, if an individual was chosen to be a spokesperson, how did you understand that person to earn $1 million?

A.  I expected they would be paid a million dollars, because that's what the communication said.

Q.  Okay.  Do you see anything on this post that says "random"?

A.  I don't.  It's the implication that

**46**

makes it seem like it would be a random person that wins.

Q. Okay. What was your understanding about whether signing alone would be sufficient enough?

A. Because that's what the communication was.

Q. What was the communication exactly?

A. That if you signed up, that you would have a chance to win a million dollars.

Q. Okay. So just providing --

A. Do you think anybody would have signed if they had have known it was fake? C'mon, you-guys. That's ridiculous.

Q. How would you describe this messaging? Did it come across as political rally as advocacy messaging or --

A. Fraudulent; fake; whatever you want to call it. Self-serving.

Q. Would you say this reads like detailed instructions for a formal program?

A. Obviously not clear.

Q. Okay. When you saw the news article of Elon Musk promoting this petition, would you say that his statements were sort of, like,

**47**

detailed instructions for a formal program?

A. They were false and misleading.

Q. Would you say that they were political messaging supporting --

A. They were encouraging people for his own purposes.

Q. Okay. Did you understand any of these statements to be descriptions of a process?

A. Yes. But obviously one that a million people misunderstood.

Q. Could you describe to me what you understood that process to be.

A. Okay. I don't know how many times I have to say the same thing. That there was going to be a chance to win a million dollars, and if you signed up, you would be entered in that chance.

Q. Okay. And when you say "chance," did you see any social media posts, any news, anything officially from America PAC or Elon Musk that said "chance"?

A. Opportunity -- I don't know, but that was the implication.

Q. Okay. Did you ever hear them say

**48**

anything about a lottery?

A. Again, it was the implication that that's the type of drawing it would be

(Exhibit 5 marked for identification.)

BY MS. LINTHORST:

Q. Okay. I'm going to drop another --

MS. LINTHORST: Okay. Please mark that as Exhibit 4, if you have not already.

BY MS. LINTHORST:

Q. I'm going to be putting another exhibit in the Chat. Bear with me.

A. Okay.

Q. Let me know when you see it.

A. Okay.

Q. Okay. Does it look like a "Petition in Favor of Free Speech and the Right to Bear Arms. Earn $1 million"?

Do you see that?

A. Yes.

Q. Okay. So if I represent to you today that this is a screenshot of the page of the petition page on November 1st, would you have any reason to dispute that?

A. No. I am expecting that you're

**49**

telling the truth. I certainly hope so.

Q. Okay. So we'll see here, it looks like it represents individuals that earned $1 million up until November 1st.

We'll see -- I'm going to count here. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 -- 14.

Did you Count 14 individuals by November 1st, as well, with me?

A. Yes.

Q. Okay. So we have John from Harrisburg, Pennsylvania was the first winner; Kristine in Pittsburgh, Pennsylvania is the second winner; Shannon from McKees Rocks, Pennsylvania is the third; Andy from Holly Springs North Carolina is the fourth; Jason from Holland, Michigan; Brian from Wisconsin; Marie from Nevada; Judey from Pennsylvania; Nancy from Arizona; Jordan from Michigan; Wayne from Georgia; Joshua from North Carolina; Dacey from North Carolina; and Ronald from Michigan, correct?

A. Yes.

Q. And then it says November 2nd there's going to be a $1 million earner from

50

Wisconsin, correct?

A. Yes.

Q. Is it fair to say it sounds like they were going to be choosing someone from Wisconsin on November 2nd, correct?

A. Correct.

Q. So no one from Arizona would have won on November 2nd; is that correct?

A. Correct.

Q. Would it be fair to say that we do not know who from Wisconsin was going to be announced; is that correct?

A. That's true. We wouldn't know, but I think the inference that you had is that you'd already pre talked to somebody, they already had who was going to win from Wisconsin, and that wasn't what was represented publicly.

Q. Would it be fair to say that someone random from Wisconsin could have been chosen to win?

A. That's what we would have expected.

Q. Okay. How about on November 3rd? It says someone from Arizona; is that correct?

A. Correct.

Q. Okay. But we do not know who from

51

Arizona?

A. Correct.

Q. So it could have been someone random from Arizona on November 3rd?

A. Well, it could have and should have been, but it doesn't sound like that's the way the program was done.

Q. Is there any indication that an individual was chosen before that date on reading it right here in front of you today?

A. Not from this communication.

Q. Okay. For November 4th, it says someone from Wisconsin; is that correct?

A. Yes.

Q. So no one from Arizona would have been chosen on that day; is that correct?

A. Correct.

Q. But someone random from Wisconsin, certainly?

A. Right.

Q. And then November 5th, it says 1 million from Michigan; is that correct?

A. Yes.

Q. So no one from Arizona?

A. Right.

52

Q. However, someone random from Michigan?

A. That's what was expected.

Q. Okay. So reading this here today, it looks like twice Arizona was chosen.

We see one Nancy earned $1 million in Arizona, and then, again, a random individual from Arizona would have been chosen to earn $1 million on November 3rd; is that correct?

A. Was it truly random?

Q. I will not be answering that question.

A. Okay.

Q. But is that correct? Or do you need me to read --

A. That's what it looks like, yes.

Q. Okay. Do you see anything here that indicates that it would be a lottery?

A. It implies that it will be --

Q. Uh-huh.

A. -- when it says one person will be chosen from Arizona, and there were lots of people that signed up, or one person will be chosen from Michigan.

It doesn't say "We have preselected

53

somebody from Wisconsin that we'll announce on November 2nd," which is what seems like was the actual truth.

Q. Okay.

A. C'mon, you-guys. Didn't Elon have good attorneys advising them during this process? Because it seems like it was just a big fake ploy to trick people.

Q. Okay. Did you see any explanation that confirmed your understanding about how an individual would earn $1 million before you signed?

A. No. It implied that it would be random.

Q. How confident were you that you had the ability to earn $1 million when they were choosing someone from Arizona?

A. It's a random drawing. No confidence at all. It could have been me or it could have not, but the truth was it couldn't have been me because they preselected somebody.

Q. Okay. Did you seek out any clarification about the selection process before you signed?

A. No. It didn't seem to be necessary.

54

Q.   Okay.  Did you seek out any clarification after you signed?

A.   Again, it did not seem necessary.

Q.   Okay.  When did --

A.   It didn't seem necessary until Elon Musk announced that he had preselected everybody prior to everybody signing up.

They already knew who they were going to give the million dollars to.

Q.   Do you recall when you heard Elon Musk say that he preselected someone?

A.   It seems like it was in a news conference.  I don't know for sure.  Maybe in Pennsylvania.

Q.   Do you recall if it was before or after the election?

A.   I don't recall.

Q.   Okay.  And it was Elon Musk that you recall saying that the folks were preselected?

A.   Yes.

Q.   Okay.  Do you recall anything else about that statement?

A.   No.

Q.   Okay.  Did you see anything that said he preselected everyone before petitions

55

were signed?

A.   No.

Q.   Okay.  What information did you have, if any, about how the selections of individuals who would earn $1 million would actually be conducted?

A.   None.

Q.   Do you have any personal knowledge of whether individuals were selected in advance of the announcements?

A.   Just from what I heard on the news.

Q.   Okay.  Did you see any documents, data, communications showing that recipients were predetermined?

A.   No.

Q.   Do you recall if it was shortly thereafter that you found out about -- or that you believe that there was a statement made about folks being preselected?

A.   I think pretty shortly, because I signed it the end of October; October 20th or so.  I don't remember for sure, but it seems like Elon Musk went on camera saying that in November, maybe.

Q.   Okay.  Is it your belief that the

56

process was not random based on facts you observed, or on conclusions you drew later from that information?

A.   It's from what I heard in the news.

MS. LINTHORST:  Okay.

Please mark that as Exhibit 5.

BY MS. LINTHORST:

Q.   Okay.  I'm going to try to do another exhibit.  Please bear with me.

I don't know if you can see that.

THE WITNESS:  So can we take just a five-minute break?

MS. LINTHORST:

Absolutely.  We can return -- I have 9:57 here.  Do you want to just return at 10:05 my time?

THE WITNESS:  Okay.

THE COURT REPORTER:

Okay.  We are going off the record at 8:57 a.m.  Thank you.

(Recess held, 8:57 a.m. to 9:06 a.m.)

THE COURT REPORTER:

We're going back on the record at 9:06 a.m.

BY MS. LINTHORST:

57

Q.   Ms. McAferty, do you mind going back to Exhibit 4?  It should be the social media post from America PAC.

A.   Okay.

Q.   Is it correct that this is the social media post that says the second $1 million check was given to an audience member in Pittsburgh?

A.   Correct.

Q.   Do you have any reason to believe that this individual did not receive $1 million?

A.   No.

Q.   Okay.  And then if we go back to Exhibit 5, it should be the "Petition in Favor of Free Speech and the Right to Bear Arms" and "Earn $1 million," and then it has the list of several individuals that earned $1 million; is that correct?

A.   Yes.

Q.   Okay.  Do you have any reason to believe that any of these individuals did not receive $1 million?

A.   No.

Q.   So is it safe to say that there were folks that received $1 million?

70

yes.

Q. Okay. What made you comfortable proceeding and signing the petition without seeking any further clarification?

A. Partially because it was my brother who forwarded it to me.

Q. Okay. Do you know if your brother worked for America PAC?

A. No, of course he doesn't.

Q. Okay. So we talked a lot about the randomness.

Is it your contention today that the randomness was promised and never occurred, or that the criteria used was different from what you understood?

A. My contention is that Elon Musk cheated, and so did America PAC. They represented something, and that was not the case; it was not true.

Q. So would it be the latter, then, that the criteria used was different than what you understood?

A. I don't know if I would call it "criteria" because the criteria was pretty well established as far as being a state you were in

71

and that you were a registered voter, but the selection was the cheating part of it.

Q. Okay. And the "cheating part" being, your words, that you are implying that it was the cheating?

A. It was fraudulent. It was communicated that everybody had a chance to win, and that was not the case.

Q. Okay. What facts support your claim that the Defendants never intended to conduct the selection process the way you thought it would work?

A. Elon Musk said it on public media, that they had preselected the winners. Is that true or not?

Q. Okay. Is there any other facts that you would say support that claim?

A. Don't you think that's enough?

Q. So you alleged that the Defendants did not actually intend to conduct the selection process in the way that it was being offered, and you say that Elon Musk made a statement indicating that that's what occurred.

Can you identify any other statement by the Defendants, for example, from America

72

PAC, that also would make you have that conclusion?

A. I do not have any specific examples.

Q. Okay. So is it fair to say that the statements that you contend that Elon Musk made, that that would be what drew you to believe that it was perhaps not random?

A. That did lead me to believe that it was not random.

Q. Okay. So nothing from America PAC?

A. Isn't Elon Musk part of America PAC?

Q. I believe you testified that Elon Musk created America PAC.

A. I said that's what I thought. I didn't say that I knew that. But my understanding is that he was very -- a big part of America PAC.

Q. Why would you say he was a big part of America PAC?

A. Because he was speaking for them. Each winner is featured on America PAC's website and X. It was Elon Musk's X platform that continually, you know, gave encouragement for people to sign up, et cetera.

Q. You say continuously Elon Musk was

73

speaking about it.

How often did you see him speak about it?

A. I don't know.

Q. And when you say you "saw him speak about it," can you just confirm, are you talking about you saw him speaking about it, like, when you looked at news articles or on social media?

A. News articles.

Q. Okay.

A. There was a lot of news interest in that story at that particular time.

Q. Did America PAC's platform post about the program, as well? Do you recall?

A. I don't know.

Q. So quickly going back to the $47, we had spoke about the $1 million payment, but for the $47 program, how did you understand, like, who would pay that? Who would pay that out?

A. That it would be America PAC/Elon Musk. I'm putting them together.

Q. Why are you putting Elon Musk and America PAC together?

A. I said it several times, because I feel like he had a lot to do with America PAC

74

getting formed.

Q. So if you were to receive a check for $47 today, who would be the signer?

MR. SHORT: Object to form.

A. It would be either Elon Musk or somebody from America PAC, I would expect.

BY MS. LINTHORST:

Q. Okay. Elon Musk or America PAC, I'm sorry, is that what you said?

A. Yes.

Q. Okay. After you signed the petition, what did you expect would happen next?

A. I guess that there would be announcements of who won the million dollars.

Q. Okay. Did you expect to hear back from America PAC after you signed?

A. Only if I won.

Q. Did you receive any sort of communication letter from America PAC after you signed?

A. I don't remember.

Q. Did you --

A. If anything, it was just a confirmation of signing up on the website, --

75

Q. Okay.

A. -- but I don't even recall if that happened.

Q. If you do have that, would you please provide that, as well?

A. Yeah, I don't know that I do. But that's really just a typical thing that happens when you do -- like I said, I haven't done a political petition before, but for other types of businesses, if you sign up, you typically get some confirmation.

Q. Do you recall hearing back from Elon Musk after you signed?

A. I did not hear back from him.

Q. Did you receive any communication from him after you signed?

A. No.

Q. Did you take any steps after signing to follow up or pursue the $1 million opportunity?

A. No.

Q. Have you searched your emails for any communications related to the petition?

A. Yes.

Q. And were you able to find any?

76

A. No.

Q. Okay. Did you search your phone?

A. Yes.

Q. Did you find anything other than the text messages that we'll get to?

A. No. Nothing other than the text messages.

Q. Okay. At the time you signed the petition, what was your understanding of whether you were entering into any kind of agreement with America PAC?

A. I didn't regard it as an agreement. I regarded it more as like a raffle or a lottery that you were putting your information in to have an opportunity to win.

Q. Okay. Did you have an understanding you were entering into any sort of agreement with Elon Musk?

A. Same. It was, you know, a chance to one a million dollars, but that was the sum of it.

Q. Okay. And that was based on your assumption?

A. Well, and on what was published about the -- whatever you want to call it --

77

support of a petition on America PAC's website.

Q. Okay. Did you believe a contract existed between you and America PAC?

MR. SHORT: Object to form.

A. That seems like a legal question, and not one I'm qualified to answer.

BY MS. LINTHORST:

Q. Okay. Did you understand there to be any terms that you agreed to when you signed the petition?

A. Can you explain what you mean by "terms"?

Q. That would be a question for you. Like, did you see any written terms setting out requirements or conditions for earning the $1 million?

A. Other than being a registered voter in the state of Arizona, no.

Q. Okay. Did you understand whether America PAC had discretion in deciding how many $1 million payments would be made or to whom?

A. I don't recall exactly. I know later it said something about $1 million a day -- that might have been Elon Musk

78

communicating that --

Q.   Okay.

A.   -- until election day.

Q.   Did you believe that America PAC had the discretion to decide how those $1 million payments would be made?

A.   Okay.  That's a different question.  So how the payment would be made, or who they selected to receive the payment?  Can you be more clear?

Q.   We'll go with how the payments would be made first.

A.   Yeah, I would expect they would be the ones who would say how to make them.

Q.   And then to whom?

A.   The "to whom" I expected would have been a random process; not a preselected.

Q.   Would you agree that America PAC could have had discretion in deciding who would earn the $1 million?

A.   It wasn't represented that way.

Q.   Okay.

A.   If that was the case, they should have been more clear about it.

Q.   But would you agree that they might

79

have the discretion to do so?

A.   They shouldn't have.  The way they were representing it did not sound like, "Hey, we're going to pick somebody to give this million dollars to, but we want the rest of you to sign up."  No, that was not the way it was communicated.

Q.   You contend that was not communicated, however, would you believe that America PAC had the discretion to do that?

A.   No, not in the way they represented it.  That was fraudulent.

Q.   Okay.  What did you understand your obligations to be after you signed the petition?

A.   None.  I had filled the requirement of being an Arizona resident and an Arizona registered voter.

Q.   Did you believe you had to take any further steps after signing in order to earn $1 million?

A.   No.  There was nothing on the website that said that further action was needed on my part.

Q.   Okay.  Did you believe you agreed to any -- to do anything specific in exchange for

80

money at the time you signed?

A.   You mean if I won the million dollars?

Q.   No.  Just when you signed the petition.

A.   Okay.  When I signed the petition, there was not any apparent requirements that were going to be imposed.

Q.   Okay.  What losses do you believe you suffered as a result of signing the petition?

MR. SHORT:  Object to form.

A.   I'm sorry.  I couldn't hear that.

BY MS. LINTHORST:

Q.   What losses do you believe you suffered as a result of signing the petition?

A.   So more than loss, I guess I felt a loss of trust.  You know, I expected that Musk would have been a more credible source of information, and that because of his -- you know, that he's so well known, that he would have run that program in a way that wasn't fraudulent and that wasn't fake.

And that it, you know, was simply a

81

publicity stunt to gather people's information up to use, you know, however they were going to use it, but not in a way that had agreement by the people that did it.

A million people signed up for that.  They would not have signed up for that if they had known that it wasn't -- there was no chance of winning.

I do think it's wrong.  He needed to be more honest, and America PAC along with him.  It feels like they did it as a publicity stunt, and now, because they did it the wrong way, they're trying to get out of any responsibility for it.

Q.   I believe you said 1 million people signed the petition.

How do you know that?

A.   It's just what has been reported, that there was more than a million people that signed up for it.

Q.   Okay.  And when you say "reported," do you mean the media?

A.   I thought it was a claim that America PAC made.

Q.   Okay.  Did you lose any money as a

82

result of signing the petition?

A. Not to date, that I know of.

Q. Okay. Have you paid for credit monitoring because you signed the petition?

A. Not different than what I already had existing.

Q. Have you identified any misuse of your personal information?

A. Not that I know of yet.

Q. Have you been contacted by third-party advertisers as a result of signing?

A. I don't know if it's as a result of signing. Probably every American gets contacted by third-party advertisers all the time.

Q. How has signing the petition affected you personally?

A. In what way? Can you be more specific?

Q. After you signed the petition, I mean, how would you describe --

MS. LINTHORST: I guess we can strike that, because that's a question for you.

BY MS. LINTHORST:

Q. Are there any expenses you incurred

83

that you attribute directly to signing the petition?

A. No.

Q. Other than providing your contact information, how do you believe you were harmed by signing the petition?

A. I'm embarrassed. You know, it was a fake thing and I fell for it. It's a scam.

Q. Okay. So in terms of going back to that question I asked, how has signing the petition affected you personally, you would say you were embarrassed by signing it?

A. Yes. I was ashamed; like, why did I fall for that scam?

Q. Is there anything else?

A. Can you be more specific? Anything else what?

Q. Anything else that you're feeling?

A. Well, kind of angry, I guess.

Q. Okay. What is the connection, in your view, between your individual petition submission and any benefit you believe America PAC received?

A. Well, them just being able to brag that they had a million people, you know, sign

84

the petition.

I don't know the specific benefits they received, but definitely publicity; definitely there was probably some political advantage gained by them; and I don't have any certain knowledge of what benefits they received, because I have no idea how they used all that personal identifying information.

Q. Okay. And, again, when you say "they announced that they had received approximately 1 million," you're saying "they," meaning America PAC announced?

A. Yes.

Q. Okay. Did signing the petition cause you to refrain from doing anything you otherwise would have done?

A. Well, I probably won't sign up for another one.

Q. Okay. When you say you "won't sign up for another one," do you mean you won't sign up for another political petition, or any petition generally?

A. Well, any petition sponsored by America PAC or Elon Musk, for sure.

Q. Okay. But you may sign other

85

petitions?

A. Well, not unless I had a lot more trust.

Q. But it could happen if it's maybe unrelated to America PAC or Elon Musk?

A. I don't know, to be honest. I'd have to judge it at that time.

Q. Okay. Did signing the petition change your legal rights or obligations in any way?

MR. SHORT: Object to form.

A. Yeah, I hope not, but I don't know.

BY MS. LINTHORST:

Q. Sitting here today, are you still concerned about you providing your personal information?

A. Always; yes.

Q. Can you tell me what those concerns are.

A. Well, just having your information out in a public domain is kind of scary, especially one that has proven to be not very honest.

Q. Why would you say that's scary?

86

A.  Because public information is misused all the time, every day.  Personal identifying information.

Q.  How would you say it's misused?

A.  People stealing it; people selling it.

Q.  Before this lawsuit, did you request America PAC delete your information?

A.  No.  I didn't know that was an option.

Q.  If you could request it today, would you request it?

A.  Yes.  But would they have assurances that it hadn't been already propagated to everybody?

Q.  So what relief are you personally seeking from this lawsuit?

A.  I want America PAC and Elon Musk to admit that they committed fraud on all those million people.

Q.  Okay.  Would you say you're experiencing any ongoing harm?

A.  I don't know.

(Exhibit 7 marked for identification.)

BY MS. LINTHORST:

87

Q.  Okay.  I'm going to try and drop another exhibit in here.  Again, bear with me.  Let me know when you see it.

MS. LINTHORST:  This is going to be Exhibit 7.

BY MS. LINTHORST:

Q.  Did it go through?

A.  It's here.  It just hasn't gone through.

Q.  Okay.  Take your time.

A.  There we go.  Okay.  It's open.  I have it.

Q.  Okay.  Does it appear to you as a group text message?

A.  Yes.

Q.  Have you seen this before?

A.  I think this is the text I provided to you.

Q.  Yes.  Okay; great.

So I see 13 people in this group chat; is that correct?

A.  Yes.

Q.  Who are the 13 individuals?

A.  I don't know them all.  It was my brother who sent the text.  The "WW" is my

88

brother.

Q.  Okay.  So these were all of his contacts, including yourself?

A.  Right.

Q.  Okay.  If you were to open this text message on your phone, would you be able to see any names?

A.  Oh, I don't know that.  They -- probably not unless they were in my contact list, right?

Q.  Okay.  And then if we scroll to the second page, there's a bubble that says "I signed," smily face.

Is that you?

A.  That's me, letting my brother know I signed.

Q.  Okay.  Do you recall any responses to that?

A.  Nobody else that said "I signed."

Q.  Okay.  Did your brother reply?

A.  I don't recall that he did.

Q.  Okay.  So this was the only communication on this group chat?

A.  I believe so.

Q.  Did you ever ask your brother if any

89

of his other friends signed it?

A.  I didn't.

Q.  Okay.  And do you have any reason to believe that anyone in this group chat worked for America PAC?

A.  I have no reason to believe that.

Q.  Okay.  Do you know when this text message was sent?  Because we can see that you replied on October 20th.

A.  Yeah.  It was just earlier that -- I don't know, like, at 7:30 or something.  It was just before.  It doesn't show up here, does it?  What does that say, "5:50" up at the top?

Q.  Yes, but I don't see a date.  But you're saying that it was probably the same date, October 20th?

A.  It was the same day.

Q.  Okay.  Did you and your brother ever talk about the petition after you signed it?

A.  I can't remember anything specifically about it, you know?

Q.  So you and your brother never spoke about signing the petition after you both signed it?

A.  No, not really.

# Appx. 4
# X Post dated October 19, 2024 (AMPAC001175)



**Click here for post - including full video**

AMPAC001175

Appx. 5
X Post dated October 20, 2024 (AMPAC001176)



Click here for post - including full video

AMPAC001176

Appx. 6
X Post dated October 20, 2024 (AMPAC001187)



**Click here for post - including full video**

AMPAC001187

Appx. 7
"Earn $1,000,000" Petition Page (AMPAC0001855)

🇺🇸 **AMERICA** 🇺🇸

# Petition in Favor of Free Speech and the Right to Bear Arms

## EARN $1,000,000!

John earned $1,000,000 in Harrisburg, PA!
Kristine earned $1,000,000 in Pittsburgh, PA!
Shannon earned $1,000,000 in McKees Rocks, PA!
Andy earned $1,000,000 in Holly Springs, NC!
Jason earned $1,000,000 in Holland, MI!
Brian earned $1,000,000 in Eau Claire, WI!
Marie earned $1,000,000 in Pahrump, NV!
Judey earned $1,000,000 in Lancaster, PA!
Nancy earned $1,000,000 in AZ!
Jordan earned $1,000,000 in Hastings, MI!
Wayne earned $1,000,000 in Griffin, GA!
Joshua earned $1,000,000 in NC!
Dacey earned $1,000,000 in Fremont, NC!
Ronald earned $1,000,000 in Clarkston, MI!
Nov 2- A $1,000,000 earner from Wisconsin will be announced.
Nov 3- A $1,000,000 earner from Arizona will be announced.
Nov 4- A $1,000,000 earner from Wisconsin will be announced.
Nov 5- A $1,000,000 earner from Michigan will be announced.
Each day through Nov. 5, one petition signer from either PA, GA, NV, AZ, MI, WI, or NC will earn $1,000,000.

The First and Second Amendments guarantee freedom of speech and the right to bear arms. By signing below, I am pledging my support for the First and Second Amendments.

**In appreciation for your support, you will receive $47 for each registered voter you refer that signs this petition. Payments are already being processed. Due to volume, all payments are expected to be issued on or before Nov. 30, 2024.**

Our goal is to get 1 million registered voters in swing states to sign in support of the Constitution, especially freedom of speech and the right to bear arms. This program is exclusively open to registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina. Expires November 5.

**This offer has now expired.**
**SPECIAL OFFER FOR PENNSYLVANIA REGISTERED VOTERS**
Sign this petition and get $100. Refer a petition signer and get $100.

*Offer valid from time of posting through 11:59 PM on 10/28. New signers only. $100 replaces standard $47 offer (not in addition to it) To be eligible, both the referrer and the petition signer must be registered voters of Pennsylvania.*

**First Name** *

First Name

**Last Name** *

Last Name

**Email Address** *

Email Address

**Cell Phone Number** *
Will only be used to confirm you are the legitimate petition signer. No other purpose.

Cell Phone Number

**Mailing Address** *

Street Address

Use Manual Address

**Did someone refer you?**

**Email or Cell Phone Number**

Email or Cell Phone Number

**SIGN PETITION** ›

Each person may only sign this petition once. Eligible people may only list one eligible person as their referrer. Signing the petition on behalf of another person is not permitted. Before payment is made, America PAC will verify the accuracy of all information of the referrer and referee. Payments of $600 or more will require the referrer to provide a signed IRS W-9 so an IRS 1099 can be issued. To be eligible, both the referrer and the petition signer must be registered voters of Arizona, Michigan, Georgia, Nevada, North Carolina, Pennsylvania, or Wisconsin.

**CONFIDENTIAL**

# Appx. 8
## Plaintiff's Text Message
## (MCAFERTY_000001–000002)



MCAFERTY_000001



MCAFERTY_000002

# Appx. 9
# Declaration of Sceusa

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JACQUELINE MCAFERTY, individually and on behalf of all others similarly situated, *Plaintiff,* | § § § § | |
| vs. | § § | No. 1:24-cv-1346 |
| ELON REEVE MUSK & AMERICA PAC, *Defendants*. | § § § | |

## DECLARATION OF CARL SCEUSA

I, Carl Sceusa, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am over the age of eighteen and competent to make this declaration. Unless otherwise stated, I have personal knowledge of the facts set forth herein. If called as a witness, I could and would testify competently to the facts set forth herein.

2. I am employed by IMGE, LLC ("IMGE") as their Chief Executive Officer. I have been employed by IMGE as its CEO since March 1 2025. I was a contractor for IMGE from 6/15/2024 to 2/28/2025, and was also a full time employee of IMGE from 2014-2018. As a result, I am familiar with the services IMGE provided to America PAC during 2024 and 2025, including services related to data storage and security and petition signer verification.

3. IMGE is a digital services and data vendor that provides technology infrastructure, data management, and voter file matching services to political committees and campaigns. During 2024 and 2025, IMGE provided such services to America PAC.

4. As part of those services, IMGE securely stored the information collected from individuals who signed the "Petition in Favor of Free Speech and the Right to Bear

1

Arms" (the "Petition"). The information collected from Petition signers included the name, phone number, email address, and mailing address entered on each petition submission.

5. IMGE maintained and secured this information using industry-standard data security protocols and safeguards.

6. The information collected from Petition signers was used for two primary purposes:

(a) to verify that Petition signatures and referrals were legitimate, including by matching the information provided against state voter registration records; and,

(b) to facilitate the issuance of referral payments to eligible individuals.

7. As part of the verification process, IMGE compared the information entered by Petition signers against state voter registration files to determine whether the signer's information matched an existing registered voter record.

8. Based on a search of IMGE's business records, I determined that IMGE was unable to match the information Plaintiff Jacqueline McAferty submitted when she signed the Petition to a registered voter record in the Arizona state voter file. As a result, it is my understanding that Ms. McAferty did not become eligible to earn for referring other individuals to sign the Petition.

9. This declaration is made in support of Defendants' Motion for Summary Judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2026.

_____
Carl Sceusa

2

Appx. 10
America PAC Privacy Notice (AMPAC0001999)

# America PAC Privacy Notice

America PAC values your privacy and trust. Personal Identifying Information collected via the www.theamericapac.org will only be used to support America PAC's activities, and it will not be shared with any advertisers, political organizations, or third parties not directly affiliated with America PAC.

 AMPAC0001999